**AMP INCORPORATED, Plaintiff-Appellant,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, and James L. Goddard, Commissioner of Food and Drugs, Defendants-Appellees.**

No. 258, Docket 31829.

United States Court of Appeals Second Circuit.

Argued Jan. 10, 1968.

Decided Feb. 13, 1968.

Jay L. Seitchik, Harrisburg, Pa. (Marshall M. Holcombe, Harrisburg, Pa., William C. Conner, of Curtis, Morris & Safford, New York City, on the brief), for plaintiff-appellant.

James G. Greilsheimer, Asst. U. S. Atty., So. District of New York (Robert M. Morgenthau, U. S. Atty., and Martin Paul Solomon, Asst. U. S. Atty., Paul Hyman, Attorney, Food and Drug Administration, on the brief), for defendants-appellees.

Before SMITH, KAUFMAN, and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This appeal from a summary judgment presents the question whether two products manufactured by appellant, AMP Incorporated, are "new drugs" within the meaning of the Federal Food, Drug, and Cosmetic Act ("the Act"), 52 Stat. 1040 (1938), as amended, 21 U.S.C. §§ 301–392.

Both of the products are intended to be used in a new method of tying off, or ligating, severed blood vessels during surgery. The conventional ligating method is to hand-tie ligatures around severed vessels by means of a surgeon's knot (which is a reef knot). AMP's products both consist of a disposable applicator, a nylon ligature loop, and a nylon locking disk. In one product, the applicator is a hemostat; in the other, it is a long slender tube. The ligature is applied by inserting the hemostat or tube into the body and placing the loop around the severed vessel, then tightening the loop and locking it in place with the disk. The excess nylon thread is cut off, and the disk and the rest of the thread remain in the patient's body.

In response to a request by AMP for classification of its products, the Food and Drug Administration advised AMP that the products were regarded as "new drugs." Under section 505 of the Act, as amended, 21 U.S.C. § 355. (Supp.1967), new drugs may not be introduced into interstate commerce without approval by the Secretary of Health, Education and Welfare. AMP subsequently decided to take the position that the products were "devices" rather than "new drugs" within the meaning of section 201(g), (h), and (p) of the Act, as amended, 21 U.S.C. § 321(g), (h), and (p) (Supp.1967), and proceeded to comply with the requirements of the Act relating to devices.[1] Under threat of regulatory proceedings should it fail to comply with the statutory and regulatory requirements pertaining to drugs, AMP sought a judgment declaring its products to be devices and an injunction barring enforcement of the "drug" and "new drug" provisions of the Act against AMP or its ligating products.[2] The District Court for the Southern District of New York, Judge Tenney, determined that the products should be classified as "new drugs," and gave summary judgment for the defendants, John W. Gardner, Secretary of Health, Education and Welfare, and James L. Goddard, Commissioner of Food and Drugs. AMP Incorporated v. Gardner, 275 F.Supp. 410 (1967). We affirm, having concluded that the construction of the Act arrived at by Judge Tenney is essentially correct.

Section 201, as amended, provides in relevant part that for the purposes of the Act:

(g) (1) The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, of any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories.

\* \* \* \* \* \*

(h) The term "device" \* \* \* means instruments, apparatus, and contrivances, including their components, parts, and accessories, intended (1) for use in the diagnosis, cure mitigation, treatment, or prevention of disease in man or other animals; or (2) to affect the structure or any function of the body of man or other animals.

1. We reject, as did the District Court, AMP's argument that a letter of the Food and Drug Administration suggesting changes in labeling of the products sub-mitted under the provisions of the Act relating to devices constitutes "tacit approval" of AMP's characterization of the products as "devices." See AMP Incor-porated v. Gardner, 275 F.Supp. 410, 412 n. 1 (1967).

2. The defendants concede that the declaratory judgment procedure is proper since there is a final determination by the Commissioner of Food and Drugs. See Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

(p) The term "new drug" means—

(1) Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, \* \* \* or

(2) Any drug the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

We begin by conceding *arguendo* the validity of AMP's contention that the hemostat and the tube, taken alone, are "instruments" and thus "devices" within the meaning of the Act. But we do not agree that the nylon thread and disk are such "components, parts, or accessories" of the hemostat and the tube as to make them "devices" as well. As Judge Tenney pointed out by way of analogy, a syringe may be a "device" under the Act, but that does not make a drug in a syringe a "device" for purposes of the Act simply because it is packed for use in the syringe. It is the thread and disk applied to the patient's body which are essential, and on which we must focus our attention.[3]

This would be an easy case were it not for the provision in section 201(g) that the term "drug" "does not include devices," for apart from that exclusion the Act's definition of "drug" is so broad as to cover easily AMP's nylon disk and thread.[4] The Act's definitions of "device" and "drug" are parallel, except for the use of "instruments, apparatus, and contrivances," rather than the broader word "articles," in defining "device."[5] In determining what things Congress meant to set apart as "instruments, apparatus, and contrivances," we take as our guide Judge Learned Hand's observation that "unless they explicitly forbid it, the purpose of a statutory provision is the best test of the meaning of the words chosen." Cawley v. United States, 272 F.2d 443, 445 (2 Cir. 1959).

In the early versions of the Act, there was no separate definition of "device." S. 2800, 73d Congress, 2d Sess. (1934), as reported by the Senate Committee on Commerce, provided in section 2(b):

The term "drug," for the purposes of this Act and not to regulate the legalized practice of the healing art, includes (1) all substances and preparations recognized in the United States Pharmacopoeia, Homoeopathic Pharmacopoeia of the United States, or National Formulary or supplements thereto; and (2) all substances, preparations, and *devices* intended for use in the cure, mitigation, treatment, or prevention of disease in man or other

---

3. We would characterize the applicator as a "component" of the thread and disk, see section 201(g) (1) (D) of the Act, as amended, rather than vice versa.

The applicator is the embodiment of a new method of applying the ligature, which is the basis of the defendants' "new drug" conclusion. 21 C.F.R. § 130.1(h) provides: "The newness of a drug may arise by reason (among other reasons) of: \* \* \* (5) The newness of a dosage, or method or duration of administration or application \* \* \*" And see Merritt Corporation v. Folsom, 165 F. Supp. 418, 421 (D.Ct.D.C.1958).

4. The basic word of the definition is "article," which is defined as "one of a class

of material things." Webster's Third New International Dictionary (1963).

5. The only other significant difference between the definitions is that the "device" definition does not include listing in the Pharmacopoeias or the National Formulary. See note 12, infra, and accompanying text.

We note the dictionary definitions of the words used: for "instrument," "utensil" or "implement"; for "contrivance," "a mechanical device"; and for "apparatus," "any compound instrument or appliance designed for a specific mechanical or chemical action or operation." Webster's Third New International Dictionary (1963).

animals; and (3) all substances and preparations, other than food, and all *devices* intended to affect the structure or any function of the body. [Emphasis added.]

See also S. 1944, 73d Congress, 1st Sess. (1933), and S. 2000, 73d Congress, 2d Sess. (1934).

Senator Copeland, who introduced all three bills, said in his prepared statement introducing S. 2800:

The present law defines drugs as substances or mixtures of substances intended to be used for the cure, mitigation, or prevention of disease. This narrow definition permits escape from legal control of all therapeutic or curative devices like electric belts, for example. It also permits the escape of preparations which are intended to alter the structure or some function of the body, as for example, preparations intended to reduce excessive weight. There are many worthless and some dangerous devices and preparations falling within these classifications. S. 2800 contains ample authority to control them.

78 Cong.Rec. 8960 (73d Cong., 2d Sess., 1934). S. 2800 contained no provisions relating to new drugs, and did not require administrative approval of any products prior to their introduction into interstate commerce.

S. 2800 was succeeded by S. 5, 74th Congress, 1st and 2d Sess. (1935–36). That bill, as introduced in the Senate, included a definition of "drug" almost identical to that in the earlier bill. The definition drew some criticism during Senate debate over an amendment (which eventually passed) to insert the word "diagnosis" so as to make the definition read in part:

All substances, preparations, and devices intended for use in the diagnosis, cure, mitigation, treatment, or

prevention of disease in man or other animals.

79 Cong.Rec. 4841–4845 (74th Cong., 1st Sess., 1935). Senator Clark (Missouri) questioned the propriety of calling purely mechanical devices "drugs":

[I]f the devices ought to be outlawed, they ought to be outlawed, and I have no objection to that; but to maintain that a purely mechanical device is a drug and to be treated as a drug in law and in logic and in lexicography is a palpable absurdity, in my opinion.

Id. at 4841. The following exchange subsequently took place between Senators Clark and Copeland:

Mr. Clark * * * The effect of the amendment [inserting the word "diagnosis"] is to declare by Federal law the scales used by a physician to test the weight of patients in connection with a diagnosis to be a drug * *

Mr. Copeland. Mr. President, I desire to state the effect of this amendment.

There are on the market certain electrical devices. A man takes hold of the handles of the machine, and the indicator spins around. It stops at "appendicitis," or it stops at "meningitis" * * * Such a device is manifestly a fraud upon society.

That is what the amendment is designed to deal with.

Id. at 4842.

The result of the criticism of calling certain mechanical devices "drugs" voiced on the Senate floor was that when the bill returned to the Senate Committee on Commerce, it was amended to add a parallell definition of devices.[6] This amendment was agreed to by the Senate without debate. 79 Cong.Rec. 8351–8355 (74th Cong., 1st Sess 1935). The change was explained by Walter G.

---

6. The substitute committee report contained no explanation of the amendment, merely noting: "A definition of devices is provided parallelling that of drugs. This expansion of the definition of the term 'drug' and the inclusion of devices are

essential if the consumer is to be protected against a multiplicity of abuses not subject to the present law." Sen.Rpt. No. 646, 74th Cong., 1st Sess. (1935). This report is reprinted in Dunn, Federal Food, Drug, and Cosmetic Act—A Statement of

Campbell, Chief of the Food and Drug Administration, during hearings held on S. 5 by a subcommittee of the House Committee on Interstate and Foreign Commerce:

> The purpose of the third subdivision is to provide for "devices." Originally, this definition of "drugs" also included devices, such as mechanical appliances and contraptions which are to be found without number. But the incongruity of classifying certain devices, such as the electric belt, therapeutic lamps, and so forth, as drugs was pointed out by the Senate in the last consideration of the bill. They felt it proper to provide an independent definition of "devices." * * *

Hearings on S. 5 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce (74th Cong., 1st Sess., 1935).[7]

We have found nothing in the legislative history of the Act indicating that the Congressional purpose in providing a separate definition of "devices" was anything other than to avoid the incongruity of classifying such things as electric belts as "drugs." There was at the time no practical significance to the distinction between "drugs" and "devices," for the operative provisions of the bill (e. g., the provision barring the introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded) applied identically to both.[8] The bill, as late as August, 1937, included no section relating to "new drugs," and no requirement

that any products covered by the bill be submitted to the government for prior approval before their introduction into interstate commerce.[9]

The bill might well have been enacted without any prior approval sections had it not been for the "Elixir Sulfanilamide" tragedy of September-October, 1937.[10] As a direct consequence of that experience, involving the deaths of nearly one hundred persons across the nation who had consumed an untested drug preparation, bills supplementing S. 5 were introduced in the 75th Congress, 2d and 3d Sess. These new bills included prior approval provisions substantially similar to the "new drug" provisions of the Act.[11] When those provisions were incorporated in S. 5 and enacted as part of it, sections 201(p) and 505, the term "new drug" was used, so far as we can determine, without any attention to the fact that the distinction between "drug" and "device" had thus for the first time become important.

■■ Since the only significance in classifying AMP's products as either "drugs" or "devices" is that if they are "drugs" they may be subject to the "new drug" provisions of the Act, we must classify them with reference to the purpose for which Congress enacted those provisions. That purpose was, very clearly, to keep inadequately tested medical and related products which might cause widespread danger to human life out of interstate commerce. The product which immediately precipitated Congressional concern—"Elixir Sulfanilamide"

Its Legislative Record, 477 (1938), which contains most of the Act's legislative history.

7. In Dunn, op. cit. supra, at 1235, 1247.

8. For a time, section 401 referred only to "adulterated drugs," but that was presumably an oversight, since the operative provision, section 706(a) (1), barred the introduction into interstate commerce "of any food, drug, device, or cosmetic that is adulterated or misbranded." See Dunn, op. cit. supra, at 532, 537, 544.
S. 5 died in the House, Id. at 633, but was succeeded by S. 5, 75th Cong., 1st and 3d Sess. (1937–38). By August, 1937,

the bill had been changed to refer throughout both to "adulterated drugs" and "adulterated devices." Id. at 752–773.

9. Ibid.

10. See Report of the Secretary of Agriculture on Deaths Due to Elixir Sulfanilamide-Massengill [Submitted in response to S.Res. 194 of November 16, 1937], in Dunn, op. cit. supra, at 1316–1327.

11. S. 3073, 75th Cong., 2d and 3d Sess., and H.R. 9341, 75th Cong., 3d Sess. For development of the Senate Bill see 82 Cong.Rec. 585 (75th Cong., 2d Sess., 1937), and 83 Cong.Rec. 1682, 6263–64, and 6423 (75th Cong., 3d Sess., 1938).

—was a drug within the everyday, narrow sense of the word, but we would hardly suppose that when Congress incorporated the "new drug" bills resulting from the "Elixir Sulfanilamide" tragedy into an Act which contained an extremely broad definition of the word "drug" it intended that the operation of those provisions should be restricted to products commonly called "drugs," and that products such as ligatures, which might present the very dangers the provisions were designed to meet, should be excluded. We would, moreover, be reluctant to give a narrow construction to this statute, touching the public health as it does. Cf. United States v. Dotterweich, 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943). AMP's ligatures are of nylon suture material of the type recognized in the United States Pharmacopoeia, 691 (17th rev.ed. 1965), and such suture material has always been regarded as "drugs" by the Food and Drug Administration.[12] The exclusionary classification "devices" should, we think, be limited to such things as Congress expressly intended it to cover. The language of section 201(g) plainly permits calling AMP's nylon thread and disk, in their intended use, "drugs," and we hold that that is their appropriate classification.

It remains to consider whether AMP's products are "new drugs" within the meaning of section 201(p) of the Act, and whether this was an appropriate case for summary judgment.

Defendants submitted the affidavit of William J. Gyarfas, M. D., Acting Director of the Division of Dental and Surgical Adjuncts, Office of New Drugs, Bureau of Medicine, in the Food and Drug Administration. He stated:

It is my considered judgment that AMP's ligating products constitute a unique method of administration of the ligature which is not now and never has been generally recognized as safe and effective, among experts qualified by scientific training and experience to evaluate the safety and efficacy of such drugs, for use in ligating bleeding vessels during surgery.

* * * Since sutures remain implanted in the body, long-term toxicity studies are required prior to approval. These long-term toxicity studies must be made with respect to the fate of the implant in order to demonstrate that there occurs neither irritation nor carcinogenic (cancer-producing) reaction to the implant * * * [I]t is known that the size and shape of an implant may affect its carcinogenic properties * * *

AMP submitted the affidavit of Curtis P. Artz, M. D., Professor of Surgery and Chairman of the Department, Medical College of South Carolina, who stated:

That since January 1, 1966, I have conducted extensive pre-clinical and clinical studies of [AMP's] ligating instrument to determine the ease of placement, holding characteristics, and tissue reaction of the instrument.

That * * * the results show the AMP ligating instrument to be an effective device which aids a surgeon during a surgical procedure. The instrument * * * produces no adverse tissue reaction.

* * * * * *

12. We cannot accept the distinction argued for by AMP between a suture, which sews human tissue, and a ligature, which ties it. As the District Court noted, the exclusion clause of section 201(g) of the Act prevents listing in the Pharmacopoeia from being conclusive on the classification issue.

We note that the term "devices" was included in the Act in order to cover products not covered by the existing law (see, e.g., note 6 supra), that the term "drug" was defined by the existing law as a "substance * * * intended to be used for the cure, mitigation, or prevention of disease of either man or other animals" (Pure Food and Drugs Act of 1906, section 6, 34 Stat. 769), and that this court held gauze bandages to be a "drug" covered by that Act. United States v. 48 Dozen Packages, More or Less, of Gauze Bandage Labeled in Part Sterilized, 94 F.2d 641 (2 Cir. 1938).

The instrument produces no pharmacological action and is used only as a mechanical clamp.

 On the basis of these two affidavits, we must conclude that AMP's products are "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof * *," and are therefore "new drugs" within the meaning of Section 201(p) of the Act.[13]

This is, we think, an appropriate case for summary judgment. Cf. United States v. 354 Bulk Cartons Trim Reducing-Aid Cigarettes, 178 F.Supp. 847 (D. N.J.1959). While we would not necessarily accept the defendants' position that whenever a court in a case such as this one is presented with a genuine difference of opinion among experts as to a drug's safety and effectiveness, that case is ripe for summary judgment, we agree that on the affidavits presented here there remained no genuine issue of material fact to be tried.[14] AMP contends that the defendants' motion for summary judgment should not have been granted because there remained an issue as to the safety and efficacy of AMP's products. But the safety of the products is not what is at issue here. The question is whether there is general recognition among qualified experts of the products' safety and effectiveness—if there is not, the products must be submitted to the Secretary of Health, Education and Welfare for a determination as to safety, adequacy of testing, etc.[15] Since the affidavit submitted by AMP was addressed only to one doctor's opinion of the safety of the products,

whereas the affidavit of Dr. Gyarfas was addressed to the issue of general recognition of the products' safety, and it does not appear that AMP was denied the opportunity to supplement the affidavit of Dr. Artz with depositions, answers to interrogatories, or further affidavits (see Rule 56(e), Fed.Rules Civ.Proc), we must conclude that no issue of material fact remained to be tried.

Affirmed.

13. Under settled administrative practice the entire product (the applicator as well as the disk and thread) must be submitted for the Secretary's approval. See note 3, supra.

14. Defendants' position might create problems in some cases involving affidavits presenting not only a difference of opinion as to a drug's safety, but also a difference of opinion as to whether the drug is generally recognized as safe.

15. The safety of AMP's products may yet be considered in Federal Court, for section 505 provides for judicial review of administrative action—see 21 U.S.C. § 355(h) (Supp.1967).