**UNITED STATES of America,**
**Plaintiff,**

**v.**

**14 CASES, MORE OR LESS, each containing 6 bags Labeled in part: (BAG) "NAREMCO MEDI-MATIC FREE CHOICE POULTRY FORMULA (medicated) \* \* \* Net Weight 10 lbs. \* \* \* Active drug ingredients: methylrosaniline chloride...0.0198% sodium phthalysulfacetamide...0.176% sodium propionate ...1.5% iron (FE)...0.072% Copper (CU)...0.036% Cobalt (CO) ...0.-00012% ingredients: \* \* \* Guaranteed analysis: \* \* \* directions for use \* \* \* Naremco 1724 Mt. Vernon, Springfield, Missouri 65805", et al., Naremco, Inc., Defendant.**

**Civ. A. No. 2806.**

United States District Court,
W. D. Missouri, S. D.

Jan. 29, 1974.

Bert C. Hurn, U. S. Atty., Mary Ann Senner, Asst. U. S. Atty., Kansas City, Mo., Jay H. Geller, U. S. Dept. of Health, Education and Welfare, Washington, D. C., for plaintiff.

O. J. Taylor, Springfield, Mo., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

COLLINSON, District Judge.

This is a seizure and condemnation action brought under the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. §§ 301–392 (1970), to condemn a quantity of drugs known as "Myconox Medicated" (Myconox) and "Medi-Matic Free Choice Poultry Formula" (Medi-Matic). Plaintiff alleges that each article is a drug which is adulterated and misbranded while being held for sale after shipment in interstate commerce; and that, therefore, each drug is subject to seizure and condemnation within the ambit of section 334(a)(1) of the Act.[1] Specifically, plaintiff alleges that each drug is adulterated within the meaning of section 351(a)(5),[2] in that each is a "new animal drug" [section 321(w)] [3] which is unsafe [section 360b(a)(1) (A)] [4] since no approval of an application filed pursuant to section 360b(b) [5] is in effect with respect to either drug. Further, plaintiff contends that each drug is misbranded within the meaning of section 352(a).[6]

Pursuant to the complaint, the drugs were seized on November 1, 1971, by the United States Marshal for this district.

1. 21 U.S.C. § 334(a)(1) (1970) reads in pertinent part:
 Any article of . . . drug . . . that is adulterated or misbranded . . . while held for sale . . . after shipment in interstate commerce . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States . . . within the jurisdiction of which the article is found. . . .

2. 21 U.S.C. § 351(a)(5) (1970) reads in pertinent part:
 A drug or device shall be deemed to be adulterated—
 if it is a new animal drug which is unsafe within the meaning of section 360b of this title. . . .

3. See text *infra* at 927.

4. 21 U.S.C. § 360b(a)(1)(A) (1970) reads in pertinent part:
 A new animal drug shall, with respect to any particular use or intended use of such drug, be deemed unsafe for the purposes of section 351(a)(5) and section 342(a)(2)(D) of this title unless—
 there is in effect an approval of an application filed pursuant to subsection (b) of this section with respect to such use or intended use of such drugs. . . .

5. 21 U.S.C. § 360b(b) (1970) reads:
 Any person may file with the Secretary an application with respect to any intended use or uses of a new animal drug. Such person shall submit to the Secretary as a part of the application (1) full reports of investigations which have been made to show whether or not such drug is safe and effective for use; (2) a full list of the articles used as components of such drug; (3) a full statement of the composition of such drug; (4) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (5) such samples of such drug and of the articles used as components thereof, of any animal feed for use in or on which such drug is intended, and of the edible portions or products (before or after slaughter) of animals to which such drug (directly or in or on animal feed) is intended to be administered, as the Secretary may require; (6) specimens of the labeling proposed to be used for such drug, or in case such drug is intended for use in animal feed, proposed labeling appropriate for such use, and specimens of the labeling for the drug to be manufactured, packed, or distributed by the applicant; (7) a description of practicable methods for determining the quantity, if any, of such drug in or on food, and any substance formed in or on food, because of its use; and (8) the proposed tolerance or withdrawal period or other use restrictions for such drug if any tolerance or withdrawal period or other use restrictions are required in order to assure that the proposed use of such drug will be safe.

6. 21 U.S.C. § 352(a) (1970) reads:
 A drug or device shall be deemed to be misbranded—
 If its labeling is false or misleading in any particular.

Thereafter, Naremco, Inc. (claimant), intervened and filed a claim and answer.

Plaintiff filed a motion for summary judgment on the grounds (1) that Myconox should be condemned on a *res judicata* basis; (2) that there is no genuine issue of a material fact that both of the seized drugs are adulterated; and (3) that there is no genuine issue of material fact that Myconox is misbranded. Summary judgment is not sought on the misbranding allegation against Medi-Matic. Claimant has filed suggestions in opposition to plaintiff's motion for summary judgment and filed its own motion for summary judgment on the basis that this Court is without jurisdiction since only a fractional percentage of the composition of these drugs was alleged to have been shipped in interstate commerce. In addition, claimant has filed a motion for partial summary judgment on the issue of misbranding of the drug Medi-Matic on the basis of *res judicata*. Claimant has also filed a motion to dismiss or, in the alternative, for an indefinite stay of proceedings on the basis that claimant was denied due process of law because of different and allegedly discriminatory procedures and policies of enforcement between over-the-counter drugs for human usage and over-the-counter drugs for animal usage. The plaintiff has filed suggestions in opposition to each of these motions.

In light of the recent Supreme Court decisions [7] concerning definitions of certain statutory language which is dispositive of this case, it will be unnecessary for the Court to consider the *res judicata* arguments raised by the parties. Claimant's other motions raise questions of law which we must decide before ruling on the plaintiff's motion for summary judgment.

■ *Claimant's Motion for Summary Judgment*: In its motion for summary judgment, claimant challenges the juris-

diction of this Court, and presumably the legality of plaintiff's seizure of these drugs. Claimant argues that the only allegations connecting these drugs with interstate commerce is that methylrosaniline chloride (gentian violet), an active ingredient in both drugs, was shipped from Cincinnati, Ohio, to Springfield, Missouri. Claimant does not dispute that the gentian violet was shipped in interstate commerce, but does contend that since this ingredient constitutes only .66 of 1 per cent of the composition of Myconox, and only .0198 of 1 per cent of Medi-Matic, these drugs would not be subject to the Act. In support of this position, claimant cites several cases which have held that an article is not subject to the Act where the only components shipped in interstate commerce were either minor ingredients of the final product, or components which lost their identity in the combined product. *E. g.,* United States v. 39 Cases, . . ., 192 F.Supp. 51 (E.D. Mich.1961); United States v. 40 Cases, . . ., 188 F.Supp. 290 (N.D.N.Y. 1960), rev'd, 289 F.2d 343 (2d Cir. 1961); United States v. An Article or Device Consisting of 31 Units . . ., 180 F.Supp. 52 (E.D.Mich.1959). The ingredient shipped in the instant case was an active ingredient, however, and this is sufficient to bring these drugs within the purview of the Act. "Shipment of the active ingredient of a drug is the equivalent of shipping the drug." Palmer v. United States, 340 F.2d 48, 49 (5th Cir. 1964), cert. denied, 382 U.S. 903, 86 S.Ct. 238, 15 L.Ed.2d 156 (1965). *See also* United States v. 40 Cases, . . ., 289 F.2d 343, 345 (2d Cir. 1961), cert. denied, 368 U.S. 831, 82 S.Ct. 54, 7 L.Ed.2d 34 (1962).

■ *Claimant's Motion to Dismiss*: In its motion to dismiss or for an indefinite stay of proceedings, claimant alleges that the Commissioner of the Food and

7. Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); CIBA Corp. v. Weinberger, 412 U.S. 640 (1973); Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); USV Pharmaceutical Corp. v. Weinberger, 412 U. S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973).

Drug Administration (FDA) has established a policy of non-enforcement against over-the-counter drugs for human use pending review of those drugs while adopting a policy of enforcement against veterinary over-the-counter drugs without such review.[8] This difference between the procedures for similar drugs subject to similar provisions of the Act, claimant contends, is discriminatory and so arbitrary, capricious, unreasonable and irrational as to be violative of due process.

We believe that claimant's argument is without merit. The due process clause of the Fifth Amendment bars only invidious discrimination or classifications which are utterly lacking in rational justification. Flemming v. Nestor, 363 U.S. 603, 611–612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). A classification which is reasonable in relation to its subject matter and adopted in the community interest satisfies due process. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Claimant has failed to show either invidious discrimination or an arbitrary or capricious classification resulting from the FDA's procedures or policies. Further, it is well established that administrative agencies have broad discretion in advancing the objectives of Congress, Pan American Airways, Inc. v. CAB, 129 U.S.App.D.C. 159, 392 F.2d 483, 496 (1968), and the relationship of a remedy to policy decisions by the agency is peculiarly a matter of administrative competence. NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); NLRB v. Luisi Truck Lines, 384 F.2d 842, 847 (9th Cir. 1967). The Courts must give deference to the choice of remedy made by an administrative agency unless it reflects abuse of discretion. United Steelworkers v. NLRB, 126 U.S. App.D.C. 215, 376 F.2d 770, 773 (D.C. Cir.), cert. denied, 389 U.S. 932 (1967). We find no suggestion of such abuse here; the rationale of the procedure for over-the-counter drugs for human use has been explained in detail by the FDA,[9] as has the relationship of this procedure to other classes of drugs.[10] There being a rational basis for the difference in procedures and no showing of abuse of discretion, we need pursue this issue no further.

■ *Plaintiff's Motion for Summary Judgment:* Rule 56(c), Fed.R.Civ.P., provides that summary judgment must be granted where the pleadings and discovery materials, together with affidavits, if any, show conclusively that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law. Summary judgment is appropriate in seizure actions under the Act. *See* Tyler Pharmacal Distributors, Inc. v. U. S. Department of Health, Education and Welfare, 408 F.2d 95, 99 (7th Cir. 1969); AMP, Inc. v. Gardner, 389 F.2d 825 (2d Cir.), cert. denied 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968); United States v. 354 Bulk Cartons . . . Trim Reducing-Aid Cigarettes, 178 F.Supp. 847 (D. N.J.1959).

■ The dispositive question in this motion for summary judgment is whether the seized articles of drug, Medi-Matic and Myconox, are adulterated within the meaning of 21 U.S.C. § 351(a)(5) (1970). Under the 1968 amendments to the Act, section 351 was amended to include "new animal drugs" which are not the subject of a new animal drug application (NADA) filed pursuant to 21 U.S.C. § 360b(b) (1970). Claimant has admitted that there have been no new animal drug applications filed for the seized drugs.[11] Thus the

---

8. 37 Fed.Reg. 85–89 (Jan. 5, 1972); 37 Fed.Reg. 7807–09 (Apr. 20, 1972); 37 Fed. Reg. 9464–75 (May 11, 1972).

9. *Id.*

10. 37 Fed.Reg. 9464–65, ¶¶ 5, 9, 10 (May 11, 1972).

11. Claimant's answers to plaintiff's interrogatories 19 and 39 of April 28, 1972.

issue presented is whether these drugs are "new animal drugs" as defined in 21 U.S.C. § 321(w)(1) (1970). That definition reads in pertinent part:

. . . any drug intended for use for animals other than man, including any drug intended for use in animal feed . . . (1) the composition of which is such that such drug is *not generally recognized,* among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. . . . (emphasis added)

The statutory definition is controlling despite any common understanding or other meaning attributable to such word or phrase. 62 Cases of Jam v. United States, 340 U.S. 593, 71 S.Ct. 515, 95 L. Ed. 566 (1951). An animal drug may therefore be a new animal drug within the meaning of the statute irrespective of the period of time during which the drug has been available. United States v. Allan Drug. Corp., 357 F.2d 713 (10th Cir.), cert. denied, 385 U.S. 899, 87 S. Ct. 203, 17 L.Ed.2d 131 (1966).

A new animal drug cannot be shipped in interstate commerce unless the information required by 21 U.S.C. § 360b(b) (1970) has been submitted for approval to the Secretary of Health, Education, and Welfare in the form of a New Animal Drug Application.[12] This required information is to establish that there have been proper investigations performed to show that the drug is safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling of that drug. 21 U.S.C. § 360b (1970). *See* Tyler Pharmacal Distributors, Inc. v. United States Department of Health, Education, and Welfare, *supra*; AMP, Inc. v. Gardner, *supra*; United States v. An Article of Drug . . . Furestrol Vaginal Suppositories, 294 F.Supp. 1307 (N.D.Ga., 1968), aff'd 415 F.2d 390 (5th Cir. 1969).

Thus, in order to establish that these drugs are new animal drugs within the meaning of the statute, the plaintiff must establish only that the drugs are not generally recognized by qualified experts as safe and effective under the conditions prescribed, recommended or suggested in their labeling. Evidence of safety or effectiveness is irrelevant to the issue of general recognition. AMP, Inc. v. Gardner, *supra* 393 U.S. at 831, 89 S.Ct. at 91.

In the five recent decisions mentioned above,[13] the Supreme Court has addressed the issue of what constitutes "generally recognized" as that term applies to "new human drugs" in section 321(p)(1)[14] of the Act. Since the language of that section and section 321(w), pertaining to new animal drugs, is nearly identical and since both statutes were derived from the same source,[15] we conclude that the Supreme Court's definition of the term "generally recognized" in section 321(p)(1) is fully

12. 21 U.S.C. § 334 (1970).

13. See note 7 *supra.*

14. 21 U.S.C. § 321(p)(1) (1970) reads in pertinent part:

The term "new drug" means—

Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. . . .

15. In 1962, Congress amended the Act to give the FDA jurisdiction to review "new drugs" for substantial evidence of both safety and effectiveness. Pub.L. No.87–781 (Oct. 10, 1962). Until the Animal Drug Amendments of 1968, there was no distinction made between human and animal drugs. The 1968 amendments separated and recompiled the provisions pertaining to animal drugs. S.Rep. No. 1308, 9th Cong., 2d Sess. ——, 1968 U.S.Code, Cong. & Ad.News, pp. 2607–2613. See Agri-Tech, Inc. v. Richardson, 482 F.2d 1148, 1150 (8th Cir. 1973).

applicable to that term in section 321(w)(1).

In the lead case, Weinberger v. Hynson, Westcott & Dunning, Inc.,[16] the Court stated:

We accordingly have concluded that a drug can be "generally recognized" by experts as effective for intended use within the meaning of the Act only when that expert consensus is founded upon "substantial evidence" as defined in § 505(d) [21 U.S.C. § 355(d)].

412 U.S. at 632, 93 S.Ct. at 2484. The Court also stated:

. . . the hurdle of "general recognition" of effectiveness requires at least "substantial evidence" of effectiveness for approval of an NDA [New Drug Application]. In the absence of any evidence of adequate and well-controlled investigation supporting the efficacy of [a drug], a fortiori [it] would be a "new drug" subject to the provisions of the Act.

412 U.S. at 629–630, 93 S.Ct. at 2483 (footnote omitted).

In a companion case, Weinberger v. Bentex Pharmaceuticals, Inc.,[17] the Court further stated:

Whether a particular drug is a "new drug," depends in part on the expert knowledge and experience of scientists based on controlled clinical experimentation and backed by substantial support in scientific literature.

412 U.S. at 652, 93 S.Ct. at 2493. Accord, CIBA Corporation v. Weinberger.[18] The "clinical experimentation" to which the Court referred in Bentex is comparable to field investigations for new animal drugs. 21 U.S.C. § 360b(d)(3)

(1970); 21 C.F.R. § 135.4a(b)(8)(ii) (1973).

The issue thus presented by the plaintiff's motion for summary judgment is whether these drugs are "generally recognized" as (1) safe[19] and (2) effective[20] for their intended uses by expert consensus founded on substantial evidence, including well-controlled field investigations. We will consider these drugs separately.

## I. Medi-Matic Free Choice Poultry Formula

Plaintiff contends that Medi-Matic is a new animal drug within the meaning of the Act because claimant had not conducted and was not aware of any tests or investigations conducted to establish either the efficacy or safety of the drug for its intended use at the time the drugs were seized.

In plaintiff's interrogatories of April 28, 1972, claimant was asked:

32. Has claimant conducted or had conducted for it, or is presently conducting or having conducted for it, or does it know of any tests or studies to determine the effectiveness or usefulness of Medi-Matic or any similar product, for the prevention and treatment of (a) enteric infections and/or (b) hemorrhagic anemia caused by Vitamin K or iron deficiency in chicken [sic] and turkeys?[21]

Interrogatory 33 requests specific and detailed information concerning the tests and studies referred to in Interrogatory 32. Claimant's answer to both of these interrogatories was as follows:

32. Yes. Tests are in process at Missouri State Poultry Experiment

16. 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).

17. 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973).

18. 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973).

19. See 21 U.S.C. §§ 360b(b)(7) and (8), 360b(d)(2) (1970); 21 C.F.R. § 135.-12(a)(5) (1973).

20. See 21 U.S.C. §§ 360b(d)(1)(E) and (F), 360b(d)(3) (1970); 21 C.F.R. § 135.12(a) (5) (1973).

21. The label on the seized articles of Medi-Matic indicated that the drug was "for use in reducing enteric infections associated with non-specific disease, and for reducing symptoms of hemorrhagic anemia caused by Vitamin K or iron deficiency in chickens and turkeys." Claimant's answer to plaintiff's interrogatory 1(c) and (d) of April 28, 1972.

Station, Charles McElyea, Director, at Mountain Grove, Missouri. Not completed. Results not yet known to claimant.

This answer clearly demonstrates that no tests of the efficacy of the drug had been completed or known at the time the drug was seized. It is apparent, therefore, that the effectiveness of this drug for its intended uses was not generally recognized. *A fortiori,* Medi-Matic is a "new animal drug" subject to the provisions of the Act. Weinberger v. Hynson, Westcott & Dunning, *supra* at 629–630, 93 S.Ct. 2469.

 A similar result is reached when the safety of Medi-Matic is considered. Plaintiff's Interrogatory 35 poses a question similar to Interrogatory 32 with respect to tests or studies designed to determine the presence or absence of any chemical residues in the tissues of turkeys and chickens which have been treated with Medi-Matic. Claimant's response to this interrogatory was an unqualified "no". Thus, by the reasoning applied above to the efficacy of the drug, Medi-Matic is a new animal drug.

## II. *Myconox Medicated*

Unlike Medi-Matic, Myconox or a similar product has been the subject of several tests for effectiveness.[22] These tests were conducted during the period 1962 through 1965. While we have grave doubts whether these tests or studies are adequate as a matter of law under the standards of 21 C.F.R. § 135.-12(a)(5) (1973), we need not consider the efficacy issue for we have concluded that the drug is not generally recognized as safe.

Plaintiff's Interrogatory 15 made the following inquiry of claimant.

15. Has claimant conducted or had conducted for it, or is presently conducting, or having conducted for it, or does it know of any tests or studies of

the tissues of chickens and turkeys which have been treated with the Myconox product in order to determine the presence or absence of any chemical residues in the tissues?

Claimant's answer to this interrogatory was an unqualified "no." Thus, for the reasons stated above with respect to the drug Medi-Matic, we find that Myconox is also a new animal drug within the meaning of the Act.

 Claimant has also raised the issue that the drugs fall within the "grandfather clause" exemption[23] in that it was sold in the United States prior to October 10, 1962, and therefore is exempt from the efficacy portion of the definition of a new animal drug.

The grandfather clause provides that the words "effectiveness" and "effective" of 21 U.S.C. § 321(w) (1970) do not apply to any drug which on October 9, 1962, met all of the following conditions:[24]

(1) was commercially used or sold in the United States;

(2) was not a new drug as defined in 21 U.S.C. § 321(p); and

(3) was not covered by an effective application under 21 U.S.C. § 355; provided that the conditions for use and labeling representations have not been changed since that date.

Having determined above that these are new animal drugs because of the absence of tests or investigations to determine the efficacy or safety of these drugs, we are of the opinion that these drugs have never been generally recognized as safe and effective for the uses intended. We conclude, therefore, that the exemption is not applicable.

Having found that both Medi-Matic and Myconox Medicated are new animal drugs without approved NADA's and, therefore, are adulterated within the

---

22. Claimant's answer to plaintiff's interrogatory 13 of April 28, 1973.

23. Pub.L. No.90–399, § 108(3) (July 13, 1968).

24. *Id.*

meaning of the Act as a matter of law, it is

Ordered that plaintiff's motion for summary judgment be granted; and it is

Ordered and adjudged that the articles of drug Myconox Medicated and Medi-Matic Free Choice Poultry Formula be condemned pursuant to 21 U.S.C. § 334 (1970), and that said articles of drug under seizure be destroyed by the United States Marshal for the Western District of Missouri; and it is

Ordered and adjudged that the costs of this action be taxed against the claimant, Naremco, Inc., as provided for by 21 U.S.C. § 334(e).