**UNITED STATES of America,**
**Plaintiff,**

**v.**

**ARTICLES OF FOOD AND DRUG COLI–TROL 80 MEDICATED,**
**Defendant.**

**Civ. A. No. 1413.**

United States District Court,
N. D. Georgia,
Gainesville Division.

Feb. 22, 1974.

916

John W. Stokes, Jr., U. S. Atty., Beverly B. Bates, Asst. U. S. Atty., Atlanta, Ga., Jay H. Geller, Atty., Dept. of HEW, Los Angeles, Cal., for plaintiff.

O. J. Taylor, Neale, Newman, Bradshaw & Freeman, Springfield, Mo., R. Wilson Smith, Jr., Gainesville, Ga., for defendant.

SIDNEY O. SMITH, Jr., District Judge.

This is a seizure action brought under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 334, to condemn a quantity of each of several articles of new animal drugs and foods. The complaint

filed on September 27, 1971, alleged that the five articles were adulterated within the meaning of 21 U.S.C. § 351(a)(5) and misbranded within the meaning of 21 U.S.C. § 352(a). Additionally, one article was alleged to be a food additive and adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C). Naremco, Inc. of Springfield, Missouri, intervened and filed claims as to all six articles.

At trial, the claim was waived by Naremco as to Coli-Trol 80 Medicated. It was stipulated that all the remaining articles were seized in interstate commerce and that the following constituted animal drugs within contemplation of the Act:[1]

Mycotrol P

Entrol S

Entrol P

F4C–60.

The following was stipulated as a food:[2]

Myconox-LF.

It was likewise stipulated that there is not now and never has been an approved new animal drug application in effect for the four drugs under 21 U.S.C. § 360b(b); nor is there any exemption in effect for the article of food pursuant to 21 U.S.C. § 348.

■ Thus at issue were the adulteration, or "new animal drug" questions plus the misbranding questions as to the four drugs; and the adulteration or "food additive" question as to the article of food. Stated differently, and giving due consideration to the burden of proof placed on the government throughout the trial[3] the questions for determination are:

1. Are the drugs not "generally recognized—as safe and effective"?[4]

2. Are the drug labels misleading?[5]

3. Is the article of food not "generally recognized _ _ _ as safe"?[6]

## FINDINGS OF FACT

This is another in a continuing series of contests between the Food and Drug Administration and Naremco over the suitability of the latter's divers veterinary products for public sale and consumption.[7] The particular products,

1. 21 U.S.C. § 321(g)(1)(B) provides: "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals,"

2. 21 U.S.C. § 321(f) provides: "The term 'food' means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

3. United States v. An Article of Drug—Bentex Ulcerine, 469 F.2d 875 (5th Cir. 1972), cert. den. 412 U.S. 938, 93 S.Ct. 2772, 37 L. Ed.2d 397 (1973).

4. 21 U.S.C. § 321(w) provides, in part: "The term 'new animal drug' means any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed,—(1) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof; . . . "

5. 21 U.S.C. § 352(a) provides: "A drug or device shall be deemed to be misbranded— (a) If its labeling is false or misleading in any particular."

6. 21 U.S.C. § 321(s) provides, in part: "The term 'food additive' means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food . . . if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures . . . to be safe under the conditions of its intended use; . . . "

7. United States v. 41 Cases, More or Less, 420 F.2d 1126 (5th Cir. 1970); United States v. Seven Cartons, More or Less, 293 F.Supp. 660 (E.D.Ill.1968), aff'd 424 F.2d 1364 (7th Cir. 1970); United States v. An Article of Drug, 362 F.Supp. 424 (S.D.Cal., 1973) (on appeal); United States v. 14 cases—Naremco Medimatic, 374 F.Supp. 922 (W.D.Mo.1974).

with the exception of F4C–60, all contain a composition of small quantities of "gentian violet" (Methylrosaniline chloride) together with sodium propionate, vitamins and minerals.[8] F4C–60 contains a composition of chelated irons, copper and cobalt. All contain inert fillers. Generally, it is contended that the gentian violet-based products are effective in the control of the organisms of candida albicans, streptococci, and staphylococci as a cause of difficulties in the digestive tracts of poultry and swine. F4C–60 is represented as effective in the control of iron deficiency anemia in both poultry and livestock.

Virtually all of the ingredients, save gentian violet, are approved for unrestricted use or are within tolerances set for use by the Food and Drug Administration. 21 CFR 121.101. The contest here revolves primarily around gentian violet. It has been used for decades as a fungicide and bactericide by man, and in the lay sense is recognized as safe and effective for human oral and vaginal consumption, as well as for topical application. A number of patent medicines containing gentian violet are available over-the-counter as old-fashioned remedies for sores, pinworms, thrush and various fungi-aided parasites. The basis of acceptance of gentian violet for human use is that experience shows it "just works." There is no study or scientific data on which to base its safety or effectiveness for humans. Claimant's theory is that the passage of gentian violet to the digestive tract of swine and poultry inhibits the growth of harmful organisms as a form of topical application. It is not shown, however, that it can be absorbed by animals out of the mucous-membranes of the digestive tract and into the bloodstream. Myconox as a feed mixture seeks to control the growth of fungi which promotes growth of the organisms in question prior to consumption.

There is no evidence that gentian violet is not safe for animal consumption. There is no evidence that gentian violet in combination with the other ingredients in the four products is

---

8. The labels reveal the following legends:

Mycotrol P—Active Ingredient .........
 Methylrosaniline Chloride 0.66%

Other Ingredients: Sodium Propionate, Ferric Choline Citrate, Menadione Sodium Bisulfite (source of Vitamin K Activity), Copper Sulfate, Potassium Chloride, Magnesium Sulfate, Manganous Oxide, Zinc Oxide, Choline Iodide, Cobalt Sulfate, Dried Kelp, Dried Whey, Emulsified Vegetable Oil, Exfoliated Hydrobiotite, Micro-cel (Diatamaceous Silica) and Flavoring.

Entrol S—Active Ingredient ............
 Methylrosaniline Chloride 0.33%

Other Ingredients: Sodium Propionate, Ferric Choline Citrate, Copper Choline Citrate, Cobalt Choline Citrate, Potassium Chloride, Copper Sulfate, Menadione Sodium Bisulfite (Source of Vitamin K. Activity), Manganese Sulfate, Iron Sulfate, Zinc Oxide, Cobalt Carbonate, Ethylene Diamine Dihydriodide, Vitamin A Palmitate, Vitamin D₂, Riboflavin Supplement, Calcium Pantothenate, Niacin, Choline Chloride, Vitamin B₁₂ Supplement, Flavoring, Diatamaceous Silica, Exfoliated Hydrobiotite and Dried Whole Whey.

Entrol P—Active Ingredient ...........
 Methylrosaniline Chloride 0.26%

Other Ingredients: Sodium Propionate, Ferric Choline Citrate, Copper Choline Citrate, Cobalt Choline Citrate, Potassium Chloride, Copper Sulfate, Dried Kelp, Magnesium Sulfate, Manganous Oxide, Zinc Oxide, Choline Iodide, Niacin, Calcium Pantothenate, Riboflavin Supplement, Menadione Sodium Bisulfite (Source of Vitamin K Activity), Vitamin A Palmitate (Source of Vitamin A), D–Activated Animal Sterol (Source of Vitamin D₃), Vitamin B₁₂ Supplement, Vitamin E Supplement, Exfoliated Hydrobiotite, Diatamaceous Silica, Flavoring and Dried Whole Whey.

Myconox—Ingredients: Sodium Propionate (37.5%), Methylrosaniline Chloride (1.56%), Copper Sulfate (14.25%), Potassium Chloride, Magnesium Sulfate, Manganous Oxide, Zinc Oxide, Ferrous Sulfate, Calcium Carbonate, Exfoliated Hydrobiotite, Emulsified Vegetable Oil and Diatamaceous Silica.

F4C–60— Guaranteed Analysis

| | |
|---|---|
| Iron (Fe) | 32,000 mgs. per lb. |
| Copper (Cu) | 3,200 mgs. per lb. |
| Cobalt (Co) | 1,000 mgs. per lb. |
| Choline | 95,000 mgs. per lb. |

Ingredients: Ferric Choline Citrate, Copper Choline Citrate, Cobalt Choline Citrate, Calcium Carbonate (11.0%), Diatamaceous Silica, Emulsified Vegetable Oil and Corn Cob Fractions.

not safe for consumption. Accordingly, the court finds as a matter of fact that all five articles in dispute are safe.

As to effectiveness, it appears that the gentian violet based products do, in fact, inhibit the growth of the offending organisms in vitro, and there is no evidence they do not do so in vivo. The problem lies in the need to do so. Increased use of antibiotics sometimes increases the growth in animals of the organisms which are present in all, but normally controlled by nature's balance, through flora. The incidence of the likelihood of any problem therefrom is minuscule. However, there is no evidence that they are not effective if there were such a problem. As in humans, the evidence preponderates to a finding that the drugs "just work." In the case of F4C–60, the problem is even more difficult to isolate. Iron deficiency is simply not an animal problem to any measureable degree. The chelated minerals are more readily absorbed, however; and if there exists a problem of iron deficiency it seems obvious that the addition of iron in any quantity would be effective in reducing the deficiency. Accordingly, the court finds that all of the articles are, in fact, effective.

■ To this extent, there is likewise no misbranding. However F4C–60 is also represented to be effective against "stress" in a flock or herd. As the court understands, stress in the veterinary concept means nervousness, excitement, strain, exhibited by impulsive physical activity such as "packing", can- nibalism and the like. In the vernacular, the flock is "off their feed." There is no known way that minerals can affect stress inasmuch as they are not tranquilizers. Accordingly, as to F4C–60, there is misbranding in that the label is false and misleading in its representation as to effectiveness against stress.

As to all five articles, there are no controlled published studies and no scientific data of in vivos tests of their safety and effectiveness. Contemporaneous or subsequent to this seizure, some tests have been undertaken seeking to demonstrate both safety and effectiveness of these or similar products. However, the results as yet are inconclusive, undistributed, and unknown except to the researchers and Naremco themselves. The completeness and validity of such tests are also open to question. A representative group of qualified research veterinarians, nutritionists, clinicians, pathologists, and microbiologists have never heard of the products by name and have never read or heard of the safety or effectiveness of the ingredients in the combinations formulated in these products. A number of poultry and swine servicemen and salesmen believe from field experience that the products are safe and effective for the uses intended. The current researchers also share this belief from in vitro tests and the limited in vivo tests underway.

The factual findings in relation to these articles may be summarized as follows:

| ARTICLE | COMPONENTS SHOWN TO BE SAFE | COMBINATION SHOWN TO BE SAFE AND EFFECTIVE | RECOGNIZED BODY OF RESEARCH DATA ON SAFETY AND EFFECTIVENESS | MISLEADING LABEL |
|---------|------|------|------|------|
| MYCOTROL P | YES | YES | NO | NO |
| ENTROL S | YES | YES | NO | NO |
| ENTROL P | YES | YES | NO | NO |
| F4C–60 | YES | YES | NO | YES |
| MYCONOX-LF (Safety only) | YES | YES | NO | |

## CONCLUSIONS OF LAW

Were it not for a series of recent Supreme Court decisions construing the 1962 amendments to the Food and Drug Laws,[9] this case would be most difficult to resolve. As seen, the court has determined that claimant's products are safe and effective. More properly stated, it has not been shown by a preponderance of the evidence that they are unsafe and ineffective. While it is apparent that the advertised need for the products is largely illusory, the court is persuaded that their use will not result in any harm and could help in isolated instances. While their need might be compared to the proverbial utility of a "wart on a toad-frog," such considerations are not the purpose of the present inquiry and no greater harm is seen to the public from their use than from several celebrated tonics and remedies now legitimately pushed on the market for humans.

However, in view of the important purposes behind the Food and Drug Laws, the statutory scheme, as approved by the courts, does not admit approval of such products on the evidence at hand. In all respects, it reasonably requires a satisfactory accounting of reliability before-the-fact or, in this instance, "substantial evidence" of reliability upon seizure. The need for such restrictive tests is obvious. Indeed, it is difficult now to police the marketing of drugs and foods which can be changed in name and form by instantaneous simple variations in composition and label, a practice apparently followed by this manufacturer over a period of years with its gentian violet remedies.

Under such circumstances, the Congress has prescribed a precise method to attest to product reliability by the application procedure before marketing. Indeed, if claimant's beliefs are as strong as professed, it is unclear why it does not proceed to get about the business of securing proof sufficient to obtain approval. In the absence of such action, a claimant is rightfully required to negate a showing of the absence of general recognition of reliability by a showing of the same preciseness.

 Quite properly, it is simply not enough to show that some people, even experts, have a belief in safety and effectiveness.[10] A reasonable number of Americans will sincerely attest to the worth of almost any product or even idea. To remove the aberrations in uniformity which can result from a well-staged "swearing match," the law requires more. Indeed, it has been heretofore held that the purpose of the normal inquiry is not to determine safety and effectiveness at all, but to ascertain the drug's general reputation in the scientific community for such characteristics. United States v. 41 Cases, More or Less, 420 F.2d 1126 (5th Cir. 1970); AMP, Inc. v. Gardner, 389 F.2d 825 (2nd Cir. 1968), cert. den. 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968). It is certain that a conflicting reputation is insufficient to establish general recognition. United States v. An Article of Drug _ _ _ Furestrol Vaginal Suppositories,

---

9. Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); CIBA Corp. v. Weinberger, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L. Ed.2d 235 (1973); USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973).

10. Throughout the trial, the government asserted an objection to the testimony of claimant's witnesses, particularly its nonprofessional witnesses, on the grounds that their testimony is inadmissible. Conceding that such testimony is "treacherous" [Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 619, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973)], in the court's view, such objection goes to worth rather than admissibility. In such proceedings, the court might well have to determine, on the misbranding claims, (1) if the product is "safe and effective" and (2) if it is "generally considered" to be so on the new drug claims. Such evidence might aid on the former, while it alone clearly cannot sustain the latter.

294 F.Supp. 1307 (N.D.Ga.1968), aff'd 415 F.2d 390 (5th Cir. 1969).

Therefore, what is required is more than belief, even by an expert; it is a general recognition based upon substantial scientific evidence as delineated in the regulatory guidelines. 21 CFR § 130.12. Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 619, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). There is no reason to differentiate the holding in *Hynson* between human drugs and animal drugs. United States v. 14 cases— Naremco Medimatic, 374 F.Supp. 922 (W.D.Mo., Number 2806, January 29, 1974). Public health considerations are similar. Further, logic would dictate no lesser standard after-the-fact than in securing an application. Indeed, the reasoning of the Supreme Court appears to be that "the reach of scientific inquiry" is the same whatever the forum. Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645(b), 93 S.Ct. 2488, 37 L.Ed. 2d 235 (1973).

■ Measured by this standard, the absence here of qualifying tests or investigations to determine the safety or efficacy of the articles renders a conclusion of general recognition impossible.[11] Even if the current tests were viable (and the court thinks not), in the absence of generally accepted literature, the most claimant would have is a conflicting reputation insufficient to establish general recognition. In any event, it is clear that general recognition is not established to the extent required by law.

Accordingly, it is concluded that Mycotrol P, Entrol S, Entrol P, and F4C–60 are new animal drugs under 21 U.S.C. § 321(w) and, being without approval, are adulterated within the meaning of 21

U.S.C. § 351(a)(5). It is likewise concluded that Myconox is a food additive under 21 U.S.C. § 321(f) and, being without approval, is adulterated within the meaning of 21 U.S.C. 342(a)(2)(c).[12] It is, therefore,

Ordered and adjudged that such articles be condemned pursuant to 21 U.S.C. § 334, and that said articles under seizure be destroyed by the United States Marshal, and all costs of this action be assessed against the claimant, Naremco, Inc. 21 U.S.C. § 334(e).

It is so ordered.

---

11. Claimant's belated assertion that somehow the combination of gentian violet with other "safe" ingredients does not produce a new drug is rejected. 21 U.S.C. § 321(w)(1). Likewise, the court knows of no exception whereby an ingredient such as gentian violet used in safety by humans can be mixed with other components considered safe so as to avoid regulation. The ultimate question is

the general recognition of the end product, regardless of its source or subjective classification. See United States v. An Article of Drug—Entrol-C Medicated, 362 F.Supp. 475(4) (S.D.Cal.1973).

12. This finding necessarily denies claimant's motion for directed verdict filed at trial.