UNITED STATES v. 184 BARRELS DRIED
WHOLE EGGS.

SAME v. 47 BARRELS DRIED
WHOLE EGGS.

SAME v. 5 BARRELS WHOLE
DRIED EGGS.

Civ. Nos. 853, 852, 1111.

District Court, E. D. Wisconsin.

Dec. 22, 1943.

B. J. Husting, U. S. Atty., and Carl Becker, Asst. U. S. Atty., both of Milwaukee, Wis., for plaintiff.

William J. McCauley, of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

This case is a consolidation of three in rem proceedings under Sec. 304(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 334(a). The claimant, Wisconsin Dried Egg Company of Oconto, Wisconsin, filed an answer denying that the eggs in actions Nos. 852 and 853 were in interstate commerce, and further denying adulteration in all three proceedings.

Sec. 304(a) of the act provides: "Seizure * * * Any article of food * * * that is adulterated or misbranded when introduced into or while in interstate commerce, * * * shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States within the jurisdiction of which the article is found: * * * *."

The eggs had been gathered by claimant from within the State of Wisconsin and were processed at claimant's plant in this State. The five barrels in Action No. 1111 were shipped to Chicago, Illinois, and there seized, and of course were in interstate commerce. However, the eggs in Actions Nos. 852 and 853 have never been outside the State of Wisconsin. They have never been offered to a common carrier for shipment, and in fact never left the property of the claimant. Under the terms of the contract between the claimant and the Federal Surplus Commodity Corporation, the claimant agreed to supply a certain number of pounds of spray dried whole eggs, but the contract provides for inspection by government agents prior to the delivery date. After inspection, the eggs in question were rejected. No shipping instructions were ever given and no bill of lading was ever issued. Additional marking and labeling remained to be added. It is my opinion that the eggs in Actions Nos. 852 and 853 had not been introduced into and were not in interstate commerce.

At the commencement of the trial, after the court had expressed doubt on the jurisdictional question of interstate commerce, plaintiff's attorney moved that the prayer for condemnation be amended by the addition of an alternate prayer for injunctive relief, in the event that the prayer for condemnation were denied on jurisdictional grounds. The government and the claimant were in court ready to present their witnesses on the merits. Both prayers for relief grew out of the same transaction. The basic issues of adulteration were identical. If the court ruled adversely to the government on the jurisdictional question, it would have been necessary to start a new action for injunctive relief, in which the same testimony would have been presented. The government and the Wisconsin Dried Egg Company would be parties to both actions. As the plaintiff well states the situation, "Both prayers for relief involve the same transaction, the same res, the same parties, the same court, the same evidence, and the same issues, save that the amendment injected one additional issue as to the appropriateness of issuing a statutory injunction." The issuance of an injunction is authorized under Sec. 302(a) of the act, 21 U.S.C.A. § 332 (a). It was believed that time and expense would be saved to all concerned by proceeding with the trial, and withholding a ruling on the motion to amend; and this

was done. Claimant objected to the amendment on the ground it changed an in rem action to one in personam. It did not ask for an extension of time and, after its objection was overruled, it presented evidence on the merits.

There can be no doubt that while the seizure action was pending, a separate suit for injunctive relief could have been commenced in this court. It would then have been appropriate for the court to have ordered a consolidation. 28 U.S.C.A. § 734; Rule 42(a) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Where a party is before the court in an in rem proceeding, the court has the power to render an in personam judgment against him. Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364. It has likewise been held that the distinction between the proceedings in rem and in personam have no proper relation to the question of jurisdiction. Hipolite case, supra. While the court may refrain from exercising such power if by so doing it would impair substantial rights, yet where it will further the ends of justice and eliminate multiplicity of action and save expense to the parties, it should be invoked. As was well stated by the court in Bee Mach. Co., Inc., v. Freeman, 1 Cir., 131 F.2d 190, 194: "Allowing the amendment, then, provides in effect only a convenient short cut to a result attainable in a more round-about way. * * *"

Sec. 304(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 334(b), provides: " * * * procedure in cases under this section shall conform, as nearly as may be, to the procedure in admiralty; * * *." There is authority that where a claimant in admiralty has intervened in an in rem proceeding and filed a general appearance, the libelant may amend his libel so as to seek relief in personam as well as in rem. The Monte A, D.C., 12 F. 331. It has also been held that the avoidance of multiplicity of action by every device that is jurisdictionally possible should be one of the main objectives of the courts of admiralty. Munson Inland Lines, Inc., v. Insurance Co. of North America, D.C., 36 F.2d 269.

Allowing the amendment to introduce a closely related cause of action against a resident defendant already before the court in effect merely dispensed with personal service which could have been had at any time. The amendment will be allowed.

Proceeding now to the merits, Sec. 402 (a) of the act in question, 21 U.S.C.A. § 342 (a) provides: "A food shall be deemed to be adulterated—* *' * (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; * * *."

Plaintiff contends that the dried whole eggs in question did consist in part of decomposed eggs, and that whether they were fit or unfit for food is beside the point. Claimant contends that while there was a trace of fermentation, and some odor (which it claims to be characteristic of such products), it denies there was any decomposition of the eggs, and contends that the food was fit for human consumption.

The egg powder in question, when seized, was not injurious to health when used as a food product. Two containers of egg powder were sent to the Home Economics Department of the University of Wisconsin for testing. Ordinary uncondemned egg powder was put in Container "A", while egg powder from the condemned barrels was put in Container "B". Professor Personius who made the tests was not informed as to which container held the condemned powder. On opening the containers she noticed that "B" had a somewhat fishy odor. She baked a custard from each sample and obtained satisfactory results. The finished products had no unpleasant odor. She also baked butter cakes from each sample, one batch being baked the night before she testified in court. The cakes were cut open in court. They were satisfactory in taste and texture, and no appreciable difference in the finished bakery products could be noted. Samples of the cakes made from the condemned egg powder were eaten with no ill effects.

With permission of government officials, eleven barrels of the original seizure of 47 barrels had been shipped to Chicago. Six of these barrels had been used by bakers prior to the time the remaining five barrels were seized in Action No. 1111. Louis Nieman, whose business is wholesale bakery supplies, was the purchaser. He had many years of experience in dealing in dried egg powder, and egg albumen (dried white of eggs), and over the years has imported large amounts of these products from China. He testified he was satisfied with the egg powder in question and described

the odor as a characteristic cold storage odor. He paid 92¢ a pound for the first barrel of powder purchased and 88¢ a pound for the other barrels, at a time when the going price of ordinary egg powder ranged from 87¢ to 95¢ a pound. He expressed the opinion that the powder was not decomposed, and said he judged it by its smooth texture and color as well as the odor. He testified further that the longer egg powder is kept in storage, the stronger its odor becomes. He sold a 50-pound batch and also one barrel to Silverstein, a wholesale cake baker who has been in the business since 1921. Silverstein testified he considered this egg powder a satisfactory product. Mr. Fred W. Lietzow, who has been a wholesaler of egg products for 32 years and who was a pioneer in the egg powder business, tasted and tested the samples of the claimant's powder which had been rejected. He testified that there was an odor to all powdered food products; that there was a slight off odor and off flavor to the powder in question; that he sent a sample of it to the largest bakery supply company in the country located at Boston; and that after that concern had tested same, it ordered a supply. Lietzow could not fill the order with claimant's powder, but he did fill it with other egg powder which had been rejected by the government at Marshfield, Wisconsin, and he received no complaint as to it.

Hence, it is well established in this case that claimant's egg powder when seized by the government was not injurious to health and further that it was fit for food for human consumption. But the government argues that it rests its case on the first part of the sentence in Sec. 402(a)(3), "if it consists in whole or in part of any filthy, putrid, or decomposed substance," ignoring the last part of the sentence, "or if it is otherwise unfit for food." Government witnesses testified as to certain scientific tests they made on the powder in question, and also as to tests previously made upon "authentic packs of dried eggs". In preparing the authentic packs, care was taken that only good quality eggs were used, and ideal sanitary conditions prevailed. The witnesses testified that under such conditions not in excess of 10 million bacteria by the microscopic count were present per gram of dried egg powder. Then other packs of good eggs were mistreated with rotten or spoiled eggs. The packs of such eggs which were dried promptly showed little if any increase in the microscopic bacterial count over known good quality eggs dried under the same conditions. However, where such mistreated eggs were permitted to stand for 18 hours in a temperature of 85°, the bacteria multiplied rapidly, in some cases exceeding one billion per gram of egg powder. The principal government witness testified that it is his conclusion that anytime the microscopic bacterial count per gram of powdered eggs is in excess of 100 million, it indicates that the eggs are in part decomposed. In answer to the court's question, the witness admitted that if a million good eggs and one bad egg were mixed, he would not regard the product as decomposed, but apparently the line was arbitrarily drawn at a bacterial count of 100 million per gram. Tests of one batch of claimant's egg powder revealed a bacterial count ranging from 1,400,000 to 5,400,000,000 per gram. The bacterial count of samples from other barrels ranged from 1,200,000,000 to in excess of 10 billion.

Another government witness testified that bacteria are responsible for the presence of formic, acetic, lactic, and butyric acids in egg powder, and that he made tests for these acids on the authentic packs and also on the dried egg powder under seizure and found that such acids were present in greater degree in the condemned powder than in the authentic packs.

Section 342(a) under which these actions were brought shows what Congress was trying to accomplish. This section has six sub-divisions: "A food shall be deemed to be adulterated—(1) If it bears or contains any *poisonous* or deleterious substance which may render it *injurious to health;* but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it *injurious to health;* or (2) if it bears or contains any added *poisonous* or added deleterious substance which is *unsafe* within the meaning of section 346; or (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise *unfit for food;* or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered *injurious to health;* or (5) if it is, in whole or in part, the product of a *diseased animal* or of an animal which has died otherwise than by slaughter; or

(6) if its container is composed, in whole or in part, of any *poisonous* or deleterious substance which may render the contents *injurious to health."* (Italics supplied.)

Reading the section as a whole, it is apparent Congress had in mind prohibiting the interstate commerce of food products which were dangerous to health and unfit for food.

Before the amendment of June 25, 1938, the comparable section of the act, 21 U.S.C.A. § 8, read that a food shall be deemed to be adulterated: "Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, * * *."

The amendment inserted the word "any" before the word "filthy" and the word "otherwise" before the word "unfit", so that it read: "A food shall be deemed to be adulterated— * * * (3) if it consists in whole or in part of *any* filthy, putrid, or decomposed substance, or if it is *otherwise* unfit for food; * * *." (Italics supplied.)

As a matter of first impression, I would conclude that the amended section indicates that Congress intended that the filthy, putrid, or decomposed substance must make the product unfit for food. There would seem to be no reason for the word "otherwise" except to refer to the first part of the sentence. However, before it was amended the courts uniformly construed the act as prohibiting the interstate shipment of food which consisted in whole or in part of any filthy, putrid, or decomposed substance, irrespective of whether it was injurious to health. See United States v. Two Hundred Cases of Adulterated Tomato Catsup, D.C., 211 F. 780, 783; United States v. Krumm, D.C., 269 F. 848, 850; United States v. Two Hundred Cases, More or Less of Canned Salmon, D.C., 289 F. 157, 158; A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542; Knapp v. Callaway, D.C., 52 F.2d 476, 477; United States v. 133 Cases of Tomato Paste, D.C., 22 F. Supp. 515, 516. It, of course, is assumed that Congress was aware of these interpretations and passed the amendment with these decisions in mind. Kepner v. United States, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114, 1 Ann.Cas. 655; United States v. Ryan, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224.

■ Bowing to this rule, I hold that the act as amended must be construed to prohibit the interstate shipment of food when it consists in whole or in part of any filthy, putrid, or decomposed substance, irrespective of whether it is fit for food or not injurious to health.

■ The remaining question is whether the government has sustained the burden of proof upon it to establish that the egg powder was decomposed. In A. O. Andersen & Co. v. United States, 284 F. 542, 544, the Ninth Circuit Court of Appeals said: "Decomposition may begin where life ends, but meat or fish is not decomposed at that early stage. Decomposed means more than the beginning of decomposition; it means a state of decomposition, and the statute must be given a reasonable construction to carry out and effect the legislative policy or intent. * * *"

In United States v. Commercial. Creamery Co., D.C., 43 F.Supp. 714, 717, Judge Schwellenbach said: "I do know that for years chemists have been seeking more efficient and rigid methods for the determination of the presence of decomposition in eggs. One need only study the reports of the Association of Official Agricultural Chemists to become aware of this effort. * * *"

The tests upon which the government here relied were developed in secret. The experimenters did not disclose the methods used in their tests or their conclusions either to the Association of Official Agricultural Chemists or to any other scientific society. Furthermore, they did not announce these tests or their conclusions to the industry. They were "sprung" on the claimant herein and apparently in one other similar action tried about the same time. In view of the long efforts to try to attain some reliable standards, it would have been only fair to all concerned for such tests and conclusions to have been disclosed to the industry so that an opportunity would have been afforded to verify them, or to determine whether the arbitrary limits stated by the department were proper conclusions to be drawn from the tests. This is especially true as all decomposition and fermentation in foods is not undesirable. Roquefort and other cheeses, and sauerkraut are examples.

The high bacteria count for the authentic pack indicated in the government tests resulted only when good eggs were contaminated and held at an 85° temperature for 18 hours or more. The evidence discloses that the claimant herein followed no such practice. It used fresh, current receipt

eggs which had been inspected by candling. They were kept at an ideal temperature up to the time when they were dried. This positive testimony offsets the expert opinion of the government witness which was based upon an experiment which was never submitted to the Association of Official Agricultural Chemists or to other learned scientific societies.

It is my conclusion that the government has not sustained the burden of proof to entitle it to an injunction to prevent the shipment in interstate commerce of the egg powder in Actions Nos. 852 and 853, and further that it has not sustained the burden upon it in the libel proceedings in Action No. 1111, and that the claimant is, therefore, entitled to judgment in all three actions.