**UNITED STATES of America,**
**Plaintiff,**

v.

**DIAMOND STATE POULTRY COM-PANY, Inc., a corporation, and David H. Polin, and Howard Polin, individuals, Defendants.**

**Crim. A. No. 836.**

United States District Court
D. Delaware.
Oct. 1, 1954.

Leonard G. Hagner, U. S. Atty., and H. Newton White, Jr., Asst. U. S. Atty., Wilmington, Del., for the United States.

Robert W. Tunnell, Georgetown, Del., for defendants.

LEAHY, Chief Judge.

The criminal information charged defendants with introduction and delivery in interstate commerce of adulterated poultry in violation of 21 U.S.C.A. §§ 331 and 333. The adulteration claimed was the presence of decomposed and diseased chickens in the shipments. At trial to the Court (jury waived) the Government introduced testimony and documentary proofs to support its charges the poultry was delivered for introduction into interstate commerce by defendants under the circumstances

charged in the two counts of the information.[1]

The defense is (1) the poultry seized by the Government was not introduced into interstate commerce by defendants; (2) the poultry examined by the Government's expert was not a part of the shipments made by defendants on September 11, and October 12, 1952; (3) the poultry was not adulterated at the time of its introduction by defendants in interstate commerce; and (4) individual defendants Howard and David Polin did not aid and abet and are not criminally responsible for the alleged shipments. Analysis and consideration of the facts, as well as the weight to be given the evidence, rejects the defense relied on in this case.

### Opinion Including Findings

1. The Government's expert examined part of the shipments. These shipments by defendants were from Lewes, Delaware, on September 11 and October 28, 1952, and arrived at dealers in New York and Newark in the early mornings of October 12 and October 29.[2] Before 7:00 A.M. on September 12 and October 29, Dr. Lewis Tarr, a veterinarian employed by the Food and Drug Administration, examined the poultry at the dealers in New York and Newark.[3] The poultry was in boxes marked "AT".[4] The letters "AT" are used by defendants and no other packers of poultry to designate second-class birds.[5]

At the September 12 examination (Count I shipment), Dr. Tarr was given a signed statement[6] by Martin Tankleff of J.A.W.D. Associates identifying the poultry examined as a portion of that received from defendants on September 12. Cross-examination showed identification was not made by Martin Tankleff but by Jack Tankleff[7] who when called testified after examining GX 12 he recalled Dr. Tarr's presence at the J.A.W.D. business establishment on September 12[8] but he could not recall other details of the signed statement GX 7.[9] GX 5, the shipping record for September 11, 1952, includes a manifest for 30 crates of "AT" poultry. On it is a notation in pencil that the four crates were to be put into storage at the request of the Food and Drug Administration. GX 5 also includes a warehouse receipt showing these crates were taken to the Manhattan Storage Company Warehouse and were later re-examined by Dr. Tarr.[10]

As to the October 29 (Count II) examination, Dr. Tarr was given a signed statement[11] by David Trenk that the poultry examined was from a shipment made by defendants on October 28. Dr. Tarr admitted he had not witnessed the arrival of the crates in the plant.[12] This simply goes to the creditability of his testimony on his cross-examination. GX 10 contains certified copies of writings relating to the seizure of these particular eleven crates of poultry. Defendant Howard Polin admitted the poultry examined belonged to defendant Diamond State Poultry Company, Inc., and these were the crated poultry examined by Dr. Tarr.[13] The testimony

---

1. Count I:
     GX 5 invoice and manifest of defendant Diamond State Poultry Company, Inc., showing shipment of poultry to J. A. W. D. Associates, New York, N. Y., on September 11, 1954.
     Count II:
     GX 5 invoice and manifest of same defendant showing shipment of poultry to Schnoll and Trenk, Newark, N. J., on October 28, 1954.
     Counts I and II:
     Testimony of Bernard Bogage, General Manager of same defendant; he recalled both shipments. Tr. 9–10.

2. Tr. 62, 71.

3. Tr. 49, 127.

4. Tr. 40, 127.

5. Tr. 121, 173, 189.

6. GX 7.

7. Tr. 198.

8. Tr. 70.

9. Tr. 76, 78.

10. Tr. 102.

11. GX 11.

12. Tr. 188–9.

13. Tr. 128.

shows a substantial portion of the poultry consisted of diseased birds;[14] such disease develops only in live birds; such diseased condition could have been discovered prior to shipment;[15] and such condition was the type which could have been visible to a grader in a packing plant.[16]

Defendants' expert, Dr. Schoneweg testified [17] the presence of the noted disease, i. e., Dr. Tarr's testimony, might not indicate the poultry was diseased at the time of slaughter. As to emaciation Dr. Schoneweg stated he would have to see the birds,[18] but Dr. Tarr did, in fact, see the birds before arriving at his conclusion of emaciation. Dr. Tarr found a greenstruck condition among the poultry and this was a symptom, he said, of decomposition.[19]

Poultry is shipped in ice to halt decomposition.[20] Defendants always ice poultry before shipment.[21] The poultry was properly iced [22] and decomposition could not have developed during the interstate shipment.[23] Dr. Schoneweg testified, however, decomposition could have commenced in a half hour after being iced under proper climatic conditions.[24] This related obviously to a hypothetical situation. There was no evidence of such in the case at bar.

■ 2. Evidence is clear defendants Howard and David Polin were responsible for the operation of defendant Diamond State Poultry Company, Inc. In response to a notice of a hearing [25] defendant David Polin appeared on October 22, 1952, and stated he had instructed his employees to be careful in grading poultry and on occasions opened crates to see if his instructions were followed.[26] Defendant Howard Polin stated he periodically checked condition of shipped poultry.[27] David Polin discussed with Dr. Tarr disposition of the seized poultry after the September 11 shipment.[28] Witness Bogage testified the individual defendants made policy for defendant Diamond State Poultry Company, Inc.[29] Individual defendants were the major officers of the corporate defendant.

■ 3. Evidence establishes a portion of the poultry in Counts I and II was decomposed. Defendants claim the evidence shows only a beginning of decomposition and this does not, as a matter of law, render an article of commerce "adulterated" under the statutes.[30] I do not think the evidence supports the application of the cases relied on by defendants. The evidence is sufficient, however, to establish the poultry sampled by Dr. Tarr was, in fact, shipped by defendants as charged in the information. GX 7 and 11, statements of Tankleff and Trenk, who received the shipped poultry, are sufficient to demonstrate defendants were the shippers of the poultry. At trial defendants attempted to show by cross-examination identification was not based upon personal knowledge that the poultry examined by Dr. Tarr was the property of defendants. There is no rigid requirement the government must bring as witnesses *all persons* who have handled any particular sample of articles charged with being the subject matter of an illegal interstate shipment. Pasadena Re-

14. Tr. 50, 52–3, 108–115, 121–125, 135–6.

15. Tr. 49, 51, 110–11.

16. Tr. 178.

17. Tr. 237–240.

18. Tr. 241.

19. Tr. 43, 46, 49, 50, 108, 114, 121, 155–6.

20. Tr. 275.

21. Tr. 274.

22. Tr. 40, 127.

23. Tr. 49.

24. Tr. 236.

25. Under 21 U.S.C.A. § 335.

26. Tr. 25–6.

27. Tr. 245–6.

28. Tr. 116–119.

29. Tr. 7, 8, 13.

30. Defendants rely for support of this proposition on A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542; and United States v. 184 Barrels Dried Whole Eggs, D.C.Wis., 53 F.Supp. 652.

search Laboratories, Inc., v. United States, 9 Cir., 169 F.2d 375, certiorari denied, 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401.[31]

■ 4. Under the Food, Drug, and Cosmetic Act, proof of personal participation of an individual defendant is not required to establish guilt if the individual is the responsible person for the operation of the business out of which the violation grows. United States v. Dotterweich, 320 U.S. 277, 280–281, 285–286, 64 S.Ct. 134, 88 L.Ed. 48:[32] United States v. Greenbaum, 3 Cir., 138 F.2d 437, 152 A.L.R. 751; United States v. Parfait Powder Puff Co., Inc., 7 Cir., 163 F.2d 1008, certiorari denied 332 U.S. 851, 68 S.Ct. 356, 92 L.Ed. 421.

## Conclusion and Verdict

The evidence at trial supports the charges made in the information. Under the applicable law both corporate and individual defendants are guilty. As there is, however, an identity between individual and corporate defendants, sentence will be measured accordingly. The United States Attorney may apply for a date for sentence at which time a judgment of sentence will dispose of the finding of guilt of all defendants. The conclusion is defendants are guilty as charged.

31. At 169 F.2d 375, at pages 379–380, 381:
"Carried to its logical conclusion, this 'chain of possession' theory would require the Government to prove affirmatively that *each* one of the many mail clerks, Administration clerks and experts, doctors, nurses, express company employees, 'and others,' handled and cared for the goods so that changes could not occur while the drugs were in their custody. It must also be shown that the products 'were not tampered with,' say the appellants.

"Such a rigorous exaction regarding proof is supported neither by reason nor by authority. If the Government were obliged to establish the absence of 'tampering' by every one who had any contact whatsoever with the drugs, the Act would be incapable of enforcement." And then at page 382 of 169 F.2d:
"The only suggestions of mishandling are in the form of *dire possibilities* conjured up by resourceful counsel. But possibilities are not proof."

32. In Dotterweich 320 U.S. at pages 280–281, 64 S.Ct. at page 136:
"The prosecution to which Dotterweich was subjected is based on a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. [Citing cases.] And so it is clear that shipments like those now in issue are 'punished by the statute if the article is misbranded (or adulterated), and that the article may be misbranded (or adulterated) without any conscious fraud at all. It was natural enough to throw this risk on shippers with regard to the identity of their wares * * *.' [Citing cases.]"

The facts upon which the Court rendered its decision are shown from the dissent in which Mr. Justice Murphy stated, 320 U.S. at pages 285–286, 64 S. Ct. at page 138:
"Our prime concern in this case is whether the criminal sanctions of the Federal Food, Drug, and Cosmetic Act of 1938 plainly and unmistakably apply to the respondent in his capacity as a corporate officer. He is charged with violating § 301(a) of the Act, which prohibits the introduction or delivery for introduction into interstate commerce of any adulterated or misbranded drug. There is no evidence in this case of any personal guilt on the part of the respondent. There is no proof or claim that he ever knew of the introduction into commerce of the adulterated drugs in question, much less that he actively participated in their introduction. Guilt is imputed to the respondent solely on the basis of his authority and responsibility as president and general manager of the corporation."