**UNITED STATES of America, Plaintiff,**

v.

**SENE X ELEEMOSYNARY CORP., INC., a corporation, also doing business as "Club SeneX"; and, Seven Freedom Pharmacy, Inc., a corporation; and Alan M. Kratz, Harry Emerson, and Roger I. Sabastier, Individuals, Respondents.**

No. 79–2661–Civ–SMA.

United States District Court, S. D. Florida.

Oct. 17, 1979.

As Amended Oct. 29, 1979.

J. V. Eskenazi, U. S. Atty., Kenneth D. Stern, Asst. U. S. Atty., Southern District of Florida, Miami, Fla., Catherine L. Copp, U. S. Food & Drug Administration, Rockville, Md., Anita Johnson, Consumer Affairs Section, Dept. of Justice, Washington, D. C., for plaintiff.

Richard J. Hays, Theodore J. Silver, Miami, Fla., for respondents.

## OPINION AND ORDER OF PRELIMINARY INJUNCTION

ARONOVITZ, District Judge.

The following Opinion and Order of Preliminary Injunction constitute findings of fact and conclusions of law for the purposes of Rule 52(a), Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### Introduction

This is an injunction action brought pursuant to section 302(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 332(a) (the Act), which grants federal district courts jurisdiction to restrain violations of section 301 of the Act, 21 U.S.C. § 331. The corporate defendants are Sene X Eleemosynary Corporation, Inc. (Sene X Corp.), 5400 Northwest 159th Street, Miami, Florida, also doing business as Club SeneX, and Seven Freedom Pharmacy, Inc., 2125 Stirling Road, Fort Lauderdale, Florida, both corporations organized and existing under the laws of the State of Florida. The individual defendants are Alan M. Kratz, President and Executive Director of Sene X Corp., Harry Emerson, Vice President and a director of Sene X Corp., and Roger I. Sabastier, a registered pharmacist and President and a director of Seven Freedom Pharmacy.

On June 19, 1979, the plaintiff filed a Complaint for Injunction, charging that the individual and corporate defendants have violated, and continue to violate, sections 301(a), 301(d), and 301(k) of the Act, 21 U.S.C. §§ 331(a), 331(d), and 331(k), in that their activities involve violations of sections 502(a), 505(a), and 502(f)(1) of the Act, 21 U.S.C. §§ 352(a), 355(a), and 352(f)(1). In essence, the Complaint alleges that the defendants are engaged in an operation to compound, promote, and distribute the product, "GH–3 (Equivalent)", an orally administered solution of buffered procaine hydrochloride 2%, as well as GH–3 Topical Cream Formulation, a skin cream. Inasmuch as plaintiff's prayer for relief seeks to enjoin the compounding, promotion, and distribution of GH–3 (Equivalent) or "any similar article of drug" (Complaint at 9), and inasmuch as the testimony establishes that Club SeneX is engaged in the compounding, promotion, and distribution of GH–3 Scalp Fluid, this opinion and Order encompass the defendants' activities with respect to the oral liquid, the skin cream, the scalp fluid, and any other "similar arti-

cle" of drug, whether or not previously compounded, promoted, or distributed by the defendants.

Regardless of the specific product, the active ingredient in all three of the defendants' products is procaine hydrochloride. Procaine hydrochloride is familiar to the layperson in its use as a local anesthetic, frequently marketed under the proprietary name, Novocaine.

A hearing was held in three segments on July 27, August 24, and September 8, 1979, at which time the Court heard live testimony and admitted into evidence affidavits and documentary exhibits. The plaintiff called five witnesses, three FDA investigators and two medical experts; the defendants offered the testimony of three witnesses, a practicing physician, an attorney who uses defendants' GH–3 oral liquid, and the defendant, Alan M. Kratz. The defendants also offered the deposition testimony of a practicing pharmacist.

### Operation of Club SeneX

The evidence adduced at the hearing demonstrates that the defendants have established and operate Club SeneX, which is based in Miami, Florida, as a means to make their products available throughout the country. The Club is purported to be a non-profit organization, the purpose of which is to disseminate educational information on health and nutrition for the elderly. To obtain any of the defendants' procaine products, an individual must join Club SeneX. In fact, most people join the Club only to obtain the GH–3 products.

To become a Club member, an individual must complete an application for membership, pay membership dues (of one hundred and thirty dollars for a six-month supply of the liquid or sixty dollars for a six-month supply of the cream or the scalp fluid), and procure a written prescription for the product, be it the liquid, cream, or oil. A membership application is included in the booklet written and distributed by Jerome Godin and Samuel Becker, *GH–3 Your Prescription for a Healthier Happier Life.* (Plaintiff's Exhibit 502c, hereafter PX 502c) A

more recent Godin-Becker booklet, *GH–3 Discovery,* includes directions on how to join Club SeneX. (PX 508c) The written prescription may be obtained from the individual's personal physician or from a physician to whom the individual is referred by Club SeneX and is to be written according to the sample prescription provided both in Club SeneX literature and in the Godin-Becker booklets. (PX 505a) The application, dues, and written prescription must then be mailed to Club SeneX in Miami, Florida.

These items are received on behalf of Club SeneX by defendant Alan Kratz, who delivers the prescriptions to defendant, Roger Sabastier, at Sabastier's Seven Freedom Pharmacy in Fort Lauderdale, Florida. Mr. Sabastier compounds the GH–3 at his pharmacy, utilizing procaine that has been shipped in interstate commerce from Bofors America, in Edison, New Jersey. Dr. Kratz picks up the compounded drug from Seven Freedom Pharmacy, and, with the assistance of Harry Emerson, packages the product with various items of promotional literature. Packages are then delivered to the Club members, usually by United Parcel Service. Records of shipments of GH–3 by Club SeneX via United Parcel Service (PX 313a, 313b, 409a, 409b, 409c, and 409d) establish that the defendants have shipped, or caused to be shipped, their product, GH–3 (Equivalent), in interstate commerce. In addition, there is circumstantial evidence of interstate shipment in the form of GH–3 prescriptions written by doctors practicing outside the State of Florida. (PX 307, 308, and 410.)

### Club Literature

The defendants distribute a variety of literature that represents that GH–3 is effective treatment for a broad range of ailments, especially those that affect the aged. (PX 505a, 505f, 505g, 506c, 506d, 508c; Defendants' Exhibit 5, hereafter DX 5). Some of this literature is distributed concurrently with the product; some is distributed separately. Literature written or distributed by the defendants also represents that GH–3

has been proven to be effective in treating such diseases and conditions. (DX 5)

Literature distributed by Club SeneX in January 1979 specifically states that "The chemical has been found not only to retard the aging process through a complex series of bodily reactions, but also to alleviate everything from hair loss and arthritis to acne and senility." The same literature further states that "there is solid U.S. scientific research evidence that GH–3 is an effective anti-depressant" and that GH–3 "has proven to be an effective bio-nutritional factor that is beneficial in dis-eases [sic] associated with premature aging." Likewise, GH–3 is represented to "prolong functional life." (PX 505a)

With respect to the specific efficacy of GH–3, Club SeneX literature states that, *inter alia,* GH–3 is effective in cancer treatment regimens because of its effects on stress. Elsewhere, the literature states that "GH–3, because of its favorable effects on chronic dis-eases [sic] such as arthritis, diabetes, hypertension and cardio-vascular conditions, *may potentiate* the effects of medication being used to treat these diseases [sic]." (PX 505e)

In April 1979, and at times thereafter, Club SeneX distributed an advertisement promoting the sale of the Godin booklet, *GH–3 Discovery,* representing it to be "factual and up to date." According to that advertisement (PX 506c),

[GH–3] has been claimed by hundreds of thousands and their physicians to safely relieve the degenerative diseases of premature aging such as senility, arthritis, rheumatism, poor hearing, muscle fatigue, depression, stress, ulcers, poor circulation, hypertension, heart disease, parkinsonism, bone disease, liver or age spots, impotence, frigidity, varicose veins, graying and balding hair, ugly wrinkling skin.

It has also been reported to be effective against other maladies not specifically associated with aging such as allergies, asthma, insomnia, obesity, multiple sclerosis, cerebral palsy, migraines, skin disease, poor eyesight.

The advertisement further states that:

Controlled clinical and laboratory studies conclusively show rejuvenation on all phases of life on which it has been tested from the most simple one celled animals . . . to . . . the most complex of all . . . MAN.

Over the past twelve months, Club SeneX has modified representations in its promotional literature. However, Defendants' Exhibit 5, established to be the most recent literature distributed by Club SeneX, still promotes GH–3 as an effective anti-aging agent. The current literature continues to state that "GH–3, because of its nutritional effect on chronic dis-eases [sic] such as arthritis, diabetes, hypertension, and cardiovascular conditions, *may potentiate* the effects of medication(s) being used to treat these dis-eases [sic]," that "there is solid U.S. scientific research evidence that GH–3 is an effective anti-depressant," and that "The chemical has been found not only to retard the aging process through a complex series of bodily reactions, but also to alleviate everything from hair loss and arthritis to acne and senility." (DX 5) Moreover, Club SeneX literature currently states that GH–3 "has proven to be an effective bio-nutritional factor that is beneficial in dis-eases [sic] associated with premature aging."

*Expert Testimony*

Two eminently qualified medical doctors, Dr. John H. Talbott and Dr. Robert J. Boucek, testified on behalf of the government. Dr. Talbott, a clinical professor of medicine at the University of Miami School of Medicine and a recognized expert in the treatment of arthritis, testified that he does not use, and has never employed, GH–3, or any similar procaine product, in treating arthritis. Moreover, Dr. Talbott testified that he does not teach the use of GH–3, or any similar procaine product, he does not recommend its use, and he knows of no colleagues or medical schools in the country which teach or recommend GH–3 or similar therapy. Based on his extensive experience and

knowledge in the treatment of arthritis as well as geriatric diseases in general, Dr. Talbott concluded that GH–3, or any similar procaine product, is not generally recognized by experts in the field as safe and effective for the treatment of arthritis, or any disease of the aged with which he is familiar.

Dr. Boucek, also a professor at the University of Miami School of Medicine, chairman of its Department of Gerontology, and a recognized cardiovascular and geriatric disease expert, testified that in the course of his thirty years of studying and treating a variety of cardiovascular ailments as well as ailments of aged generally, he has not prescribed, and does not to date prescribe, GH–3, or any similar procaine product, for the treatment of cardiovascular disease or any other disease with which he is familiar. Moreover, Dr. Boucek does not recommend or teach the use of GH–3 or GH–3 therapy. It was Dr. Boucek's expert opinion, based on his practice and familiarity with the field, that GH–3, or any similar procaine product, is not generally recognized by scientific experts as safe and effective for the treatment of cardiovascular disease or any geriatric disease with which he is familiar.

The absence of general recognition by experts of safety and effectiveness is further supported by a letter of defendant Kratz to Bofors America (PX 306) which stated that defendant Kratz (and unnamed others) were currently conducting *investigations* of GH–3 in the elderly. Thus, based on defendant Kratz's own admission, GH–3 is still in the investigative stage.

Both Dr. Talbott and Dr. Boucek further testified that it is their expert opinion that there is no clinical proof, in the form of adequately controlled clinical studies, that GH–3, or any similar procaine product, is effective in the treatment of any disease. Both doctors based their opinion in this regard, *inter alia,* on an article by Adrian M. Ostfeld, *et al.,* published in the January, 1977 issue of the Journal of the American Geriatrics Society, portions of which were read into the record, pursuant to Rule 803(18), Federal Rules of Evidence, by Doctors Talbott and Boucek. With respect to the effectiveness of procaine in the treatment of depression, Ostfeld, *et al.* concluded that "The most tenable conclusion to be drawn from the studies reviewed is that suggestive evidence of a transient antidepressant effect was obtained . . . It is impossible to state unequivocally that Gerovital [procaine hydrochloride] is an effective antidepressant." (Page 8) With respect to hypertension, Ostfeld, *et al.* concluded that "A controlled clinical trial of a potentially effective antihypertensive agent is one of the most difficult of all therapeutic studies to carry out . . . Procaine may or may not lower blood pressure. The truth of the matter is not in sight." (Page 13) Summarizing the data on procaine treatment of senile dementia and cerebral arteriosclerosis, Ostfeld and his colleagues stated at page 10:

> The results for patients with organic brain syndromes, particularly those with cerebral arteriosclerosis or senile dementia, do not indicate that any procaine preparation is particularly or consistently effective for these disorders. Results of the more adequately controlled studies were generally negative for procaine; the findings of Abrams *et al.* and of Gordon *et al.* for "European" procaine were at best equivocal. The studies reporting clearly positive findings were usually either less well controlled or without controls.

With respect to procaine effects on atherosclerotic disease Ostfeld, *et al.* stated "With a few exceptions, all the reports on the effect of procaine on the atherosclerotic process and on the clinical manifestations of atherosclerosis can only be described as preliminary, sketchy, unstructured, and almost completely uninterpretable." (Page 15)

*Defendants' Evidence of General Recognition*

The defendants offered no expert testimony that their product is generally recognized as safe and effective. Defendants' witness, William E. Walsh, an attorney licensed to practice in Florida, testified that

he had begun GH–3 therapy in September 1978 and believed that it had had beneficial effects, such as improving his vision and permitting him to reduce his thyroid medication. Dr. Roy Kupsinel, a practicing physician from the Orlando, Florida area who specializes in preventive medicine, testified that he himself takes GH–3 which he receives free of charge from Club SeneX, and that he has prescribed it occasionally for his patients. Dr. Kupsinel further testified that he believes that as a result of his GH–3 therapy, his premature gray hair and vitiligo, a skin disorder, have begun to subside.

Testimony by individual patients or by doctors concerning the experience of individual patients, is generally described as "anecdotal evidence." Dr. Boucek characterized anecdotal evidence as "the poorest form of evidence" to establish a drug's effectiveness and further stated that such evidence cannot be confused with scientific evidence. Purely anecdotal evidence—that is, testimonials by individual patients—is an unreliable way to assess a drug's effectiveness: a patient may be confused by extraneous factors so that he erroneously believes that he is benefiting from the drug. A patient may feel better as a result of the care and attention he receives while taking the drug, rather than as a result of the medication itself. Well-controlled scientific studies eliminate such extraneous factors by comparing the treated group to a "control group", that is, individuals who are nearly identical to the treated group, except that the control group does not receive the drug. Dr. Boucek further testified that physicians who feel that there is no effective treatment for a given ailment often prescribe a placebo (a therapeutically inactive substance) to a patient at the latter's request in order to provide the patient with at least peace of mind.

### New Drug Applications

A certified copy of an affidavit of Jerome A. Halperin, Deputy Director of FDA's Bureau of Drugs (PX 101), establishes that there is no approved new drug application (NDA) permitting the interstate distribution of GH–3 (Equivalent), that no such application is awaiting approval, that no such application has ever been filed with the FDA, and that there is no Notice of Claimed Investigational Exemption (IND) permitting the investigational use of GH–3 by the defendants. In cross examination, defendant Kratz admitted that he has not filed an NDA or an IND with the FDA.

### Bulk Procaine Hydrochloride

In compounding GH–3, the defendants use procaine hydrochloride purchased in bulk from outside the State of Florida. Photographs, established to be all of the labeling on the drum of procaine, show that there are no adequate directions for use, as defined in the applicable regulation, 21 CFR 201.5, on the bulk component (PX 305). A letter written by defendant Kratz to Bofors America states in part: "We are presently conducting very interesting clinical trials of Procaine in the depression associated with advanced age. The results have been promising and encouraging." Thus, the procaine was ordered with the intent that it be used to compound GH–3 (Equivalent). Cf. 21 CFR 201.120(c).

### CONCLUSIONS OF LAW

#### Jurisdiction

Under section 302(a) of the Act, 21 U.S.C. § 332(a), this Court has jurisdiction over the subject matter and of the parties before it.

#### Responsibility for "Causing" Violations

As the foregoing findings reflect, all three of the individual defendants have positions of authority and responsibility in the operation established to compound, promote, and distribute GH–3 products. As such, each of the defendants causes, within the meaning of section 301 of the Act, 21 U.S.C. § 331, the violations alleged in the Complaint.

■ It is well settled that neither physical presence nor personal participation in the act that causes a violation is required to establish responsibility under the terms of the Federal Food, Drug, and Cosmetic Act.

*United States v. Dotterweich,* 320 U.S. 277, 280, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943); *United States v. Shapiro,* 491 F.2d 335, 337 (6th Cir. 1974); *United States v. Parfait Powder Puff Company,* 163 F.2d 1008, 1009–1010 (7th Cir. 1947), *cert. denied* 332 U.S. 851, 68 S.Ct. 356, 92 L.Ed. 421 (1948); *United States v. Diamond State Poultry Company,* 125 F.Supp. 617, 620 (D.Del.1954). In *Diamond State Poultry, supra* at 620, the court said: "Under the Federal Food, Drug, and Cosmetic Act, proof of personal participation of an individual defendant is not required to establish guilt if the individual is the responsible person for the operation of the business out of which the violation grows." Hence, to commit any of the alleged violations, a defendant need not physically participate in producing, labeling, or shipping the drug. It is enough that an individual stand in a responsible relationship to such activity.

Moreover, the three individuals and two corporate defendants have established a symbiotic relationship where, through cooperative efforts, their procaine products are made available to the public. The defendants participate in an integrated activity; all of them benefit directly from this arrangement. Each defendant's respective activities under that arrangement contribute to the resulting violations of the Federal Food, Drug, and Cosmetic Act.

### New Drug Charge

Section 201(g) of the Act, 21 U.S.C. § 321(g)(1), defines a drug as "[an article] . . . intended to affect the structure or any function of the body of man . . . [or] for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man . . . ." Based on defendants' representations, GH–3 (Equivalent) is a drug within the meaning of the Act.

■ Under the Act, any drug is a "new drug" unless its composition is "such that such drug is . . . generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ," 21 U.S.C. § 321(p)(1). The government need not establish that GH–3 is either unsafe or ineffective in order to establish that it is a new drug. Rather, the government must demonstrate only that GS–3 is not *generally recognized* as safe and effective by qualified experts for use as promoted by the defendants. *AMP Inc. v. Gardner,* 389 F.2d 825, 831 (2nd Cir.) *cert. denied, sub nom. AMP Inc. v. Cohen,* 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968); *United States v. 41 Cases . . . Naremco Inc.,* 420 F.2d 1126, 1130 (5th Cir. 1970). See *United States v. Articles of Food and Drug . . Coli-trol 80 Medicated,* 372 F.Supp. 915, 921 (N.D.Ga.1971), *aff'd* 518 F.2d 743 (5th Cir. 1975). Based on the testimony of Doctors Talbott and Boucek, GH–3 is not generally recognized by experts as safe and effective for the use(s) for which it is recommended or promoted by the defendants, and is, therefore, a new drug.

■ The defendants offered little, if any, evidence to rebut this conclusion. The testimony of defendants' witnesses, Dr. Kupsinel and Mr. Walsh, is anecdotal evidence, which cannot be used to establish general recognition of safety and efficacy. The Supreme Court, in *Weinberger v. Hynson, Westcott and Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), characterized anecdotal evidence as "treacherous" and further held that "substantial evidence" of a drug's safety and efficacy, which would be sufficient to support the approval of a new drug application, must exist to substantiate a claim of general recognition; such evidence must be in the form of adequately controlled clinical investigations. 412 U.S. at 629–630, 93 S.Ct. 2469. The fact that a number of physicians throughout the country prescribe GH–3 also does not establish its general recognition. *Upjohn v. Finch,* 422 F.2d 944, 954 (6th Cir. 1970), cited with approval by the Supreme Court in *Hynson, supra,* 412 U.S. at 618, 93 S.Ct. 2469.

Although there was testimony that GH–3 is harmless, that is not a determination

which, under the Act, the Court should, or will, make; that is a determination to be made upon proper application to the FDA. Likewise, with respect to GH–3's efficacy, the Court should not, and will not, undertake to decide whether GH–3 is effective for any one of the twenty or more uses for which the product is promoted or intended. Again, that is not a determination for the Court to make; rather, it is a determination to be resolved on the basis of scientific evidence and testing in a new drug application filed with the FDA. *Weinberger v. Bentex Pharmaceuticals,* 412 U.S. 645, 652, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *United States v. An Article of Drug . . . X–OTAG TABLETS,* 441 F.Supp. 105, 109 (D.Colo.1977), *aff'd* 602 F.2d 1387 (10th Cir. 1979).

Section 505(a) of the Act, 21 U.S.C. § 355(a), states that "*[n]o person* shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application . . . is effective with respect to such drug." (Emphasis supplied.) Consequently, since this Court finds that GH–3 is a new drug for which there is no approved NDA or effective IND, the statutory prohibition applies and GH–3 cannot be shipped in interstate commerce.

### *"Practice of Pharmacy" Defense*

In the Answer to Complaint for Injunction, the activities of the defendants, Roger Sabastier and Seven Freedom Pharmacy, were alleged to constitute the practice of pharmacy, and thereby, were claimed to be exempt from the sanctions of the Food, Drug, and Cosmetic Act. (Answer at 6–7) The question of whether the customary or usual practice of pharmacy is exempt from the Act's new drug provisions need not be resolved in this case, for the means by which the defendants compound, promote,

and ultimately distribute GH–3 constitute something wholly apart from the normal practice of pharmacy.[1]

■ The relationship created by, and existing between, Club SeneX, Seven Freedom Pharmacy, and prescribing physicians, is not the customary manner by which a drug is prescribed for, and provided to, a patient. In this case, there is a corporation which is disseminating information through its literature in order to solicit applications for membership in its organization. As a result of such memberships, prescriptions for its products, which it exclusively compounds and distributes, are referred to a single pharmacy that, based on the evidence, specializes in compounding GH–3. Defendants' very representations imply that this particular pharmacy is the best equipped, if not the only pharmacy actually equipped, to utilize the particular formula and compounding method necessary to produce an effective product.

Although the formula for GH–3 is apparently available in a number of publications, defendants' own literature states that the method of producing GH–3 is a special method, known only to Alan Kratz, which he has supplied only to pharmacist Sabastier. One item of Club SeneX literature quotes Kratz as saying " . . . I happen to be the only one who knows how to put [the components of GH–3] together in a buffered, liquid, stable form." (DX 5)

There is no one-on-one relationship between pharmacist Sabastier and the patients, a customary characteristic in the usual practice of pharmacy. In fact, there is no relationship at all between the patients and the pharmacy.

In the deposition of defendants' witness, pharmacist Gerald Weinstein, Mr. Weinstein testified that while it is not unusual to have an agent act on behalf of the patient

---

1. During oral argument, defendants appeared to claim that the practice of pharmacy defense shields all the activities of all the defendants. Again, while the court need not, and does not, address the issue of whether the customary practice of pharmacy is an exemption from the Act's new drug provisions, even if such activi-

ties were so exempt, defendants Kratz and Emerson, as well as Sene X Corporation and Club SeneX, can make no colorable claim to that defense. Neither defendant is practicing pharmacy nor is the corporation or the Club a pharmacy.

when he or she has a prescription filled, this agent almost invariably knows the patient personally. Mr. Weinstein offered examples of customary agents for prescription filling: a husband for a wife, a child for a parent, or a neighbor for another neighbor. (Deposition at pages 36–37).

Here, Alan Kratz acts as agent for Club members, receiving prescriptions through the mail, delivering them to, and picking them up from, Seven Freedom Pharmacy, and finally, arranging for their delivery to Club members by UPS. However, Dr. Kratz has no personal relationship with those for whom he acts as agent.

Moreover, unlike the normal or usual practice of pharmacy, Seven Freedom Pharmacy handles a large volume of out-of-state business for prescriptions for GH–3, prescriptions written by physicians who are not known to Mr. Sabastier, and, as a practical matter, could not have been known to him. Gerald Weinstein testified that in the course of his pharmacy practice, he fills some out-of-state prescriptions, but generally only for "maintenance" drugs, defined by Mr. Weinstein as "some drug necessary for the maintenance of life." (Deposition at pages 41–42) Mr. Weinstein stated further that generally, patients have used the maintenance drug prior to requesting that he fill a prescription for it pursuant to an out-of-state prescription. There is no evidence that GH–3 is such a maintenance drug or that patients have used GH–3 prior to the dispensing of the drug by Seven Freedom Pharmacy pursuant to an out-of-state prescription.

The evidence also establishes that Seven Freedom Pharmacy is compounding and dispensing a single product, or product line, on a routine basis, in contrast to the usual practice of pharmacy, where a broad range of drugs is dispensed. Finally, pharmacist Sabastier, during at least part of the period in question, has received the bulk chemical components used to compound GH–3 from Dr. Kratz, who is not, and does not hold himself out to be, a pharmaceutical supplier. This likewise distinguishes these circumstances from the normal practice of pharmacy.

All of the foregoing facts are relevant in determining whether certain activities constitute the practice of pharmacy, but, as Chief Judge Atkins of this district held in *Cedars North Towers Pharmacy v. United States* [1978], Food, Drug, and Cosmetic Law Reports (CCH) ¶ 38,200 (S.D.Fla. August 20, 1978), this is not an exhaustive list and in a different factual setting, other factors may be appropriately considered. Moreover, the absence of any one or several of the relevant factors does not preclude a finding that an individual and his activities are not the customary practice of pharmacy. Thus, the activities of the defendants are not exempt from the new drug provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 355.

### Misbranding Violation

Under section 502(a) of the Act, 21 U.S.C. § 352(a), a drug is misbranded if its labeling is "false or misleading in any particular." Section 201(m) of the Act, 21 U.S.C. § 321(m), defines labeling as "all labels or other written, printed, or graphic matter (1) upon any article or its containers or wrappers, or (2) accompanying such articles." Neither physical attachment to the misbranded article or concurrent shipment in interstate commerce of the labeling and the misbranded article is required to establish misbranding under section 502(a) or the corresponding violation of section 301(a) of the Act, 21 U.S.C. § 331(a). *Kordel v. United States*, 335 U.S. 345, 350, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *United States v. 47 Bottles . . . Jenasol R J Formula '60'*, 320 F.2d 564, 568 (3rd Cir.) *cert. denied* 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1968), *United States v. An Article of Device . . . Diapulse*, 389 F.2d 612, 616 (2nd Cir. 1968), *cert. denied* 392 U.S. 907, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1969). "It is the textual relationship that is significant." *Kordel, supra*, 335 U.S. at 350, 69 S.Ct. at 110.

Section 502(a), as well as the statute as a whole, is to be read broadly so as to achieve "[t]he high purpose of the Act to protect consumers who under present condi-

tions are largely unable to protect themselves in this field." *Kordel v. United States, supra* at 349, 69 S.Ct. at 109. See also *United States v. An Article of Drug . . . Bacto-Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). A demonstration that *any representation* is either false or misleading is sufficient to establish misbranding. *United States v. Diapulse,* 269 F.Supp. 162, 169 (D.Conn. 1967), *aff'd supra.*

■ Defendants offered no testimony to rebut that of Doctors Boucek and Talbott that there is no clinical proof, in the form of adequately controlled clinical studies, which establishes that GH–3, or any similar procaine product, is effective for any indicated use. Any representation as to GH–3's proven efficacy is false and misleading, and therefore, GH–3 is misbranded within the meaning of section 502(a), 21 U.S.C. § 352(a).

■ Although there have been efforts to revise the literature, and although there have been substantial changes, the defendants continue to misbrand GH–3. From time to time, Club SeneX literature relies upon opinions cited in newspaper articles and third party publications, instead of making direct claims itself. By incorporating these newspaper articles, third party statements, and distributing items such as the advertisement for the Godin booklet, *GH–3 Discovery* (PX 506), the defendants endorse, and thereby adopt as their own, the statements and representations of others. Both the literature written by defendant Kratz and distributed by Club SeneX and that written by third parties, and later adopted and distributed by the Club, constitute labeling within the meaning of the Act. Use of labeling written by third parties which contains false or misleading statements constitutes misbranding; such misbranding, indirect though it may be, is just as serious as direct misbranding by the defendants. Both mislead the public; both solicit expenditure of money for unproven drugs; both divert patients from effective therapy.

### Component Misbranding

■ Under section 502(f)(1) of the Act, 21 U.S.C. § 352(f)(1), a drug is misbranded unless its labeling bears adequate directions for use as defined in the applicable regulation, 21 CFR 201.5. Drug components, included in the Act's definition of a drug, 21 U.S.C. § 321(g)(1), must also bear adequate directions for use. The Secretary of Health, Education, and Welfare may exempt by regulation from that requirement any drug where such directions for are not necessary for the protection of the public health.[2] Pursuant to her authority under section 502(f)(1), the Secretary has determined that components of prescription drugs need not bear adequate directions for use. 21 CFR 201.120. However, that exemption is made specifically inapplicable to any substance intended for use in compounding an unapproved new drug. 21 CFR 201.120(c). A drug required to bear adequate directions for use which does not do so is misbranded within the meaning of section 502(f)(1), 21 U.S.C. § 352(f)(1).

Although the procaine hydrochloride in bulk form would generally be exempt from the adequate directions for use requirement, because it is intended for use in compounding an unapproved new drug, the bulk chemical is not exempt. 21 CFR 201.-120(c). Furthermore, because it is not labeled with directions permitting safe and effective use by laypersons, the bulk procaine hydrochloride is misbranded within the meaning of section 502(f)(1) of the Act, 21 U.S.C. § 352(f)(1).

### Propriety of Injunctive Relief

■ In this case, the Court is requested to issue a statutory injunction. Where an injunction is authorized by statute, it is proper to issue such an order to restrain violations of the law if the statutory conditions are satisfied. *Federal Trade Comm'n v. Rhodes Pharmacal Co.,* 191 F.2d

2. The statutory authority of the Secretary of Health, Education, and Welfare to grant such exemptions has been delegated to the Commissioner of Food and Drugs. 21 CFR 5.1.

744, 747 (7th Cir. 1951), *reversed on other grounds*, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1955). Furthermore, in such situations, the court is not bound by the principles that apply in private equity suits. *United States v. Diapulse Corporation of America*, 457 F.2d 25, 27–28 (2nd Cir. 1972); *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Proof of irreparable harm from denial of an injunction, a traditional prerequisite for injunctive relief, need not be established where the government seeks by statutory injunction to protect the public health and effectuate Congressional policy, *Diapulse Corporation, supra*, 457 F.2d at 28, for the availability of the statutory power to enjoin violations of the statute is evidence of a Congressional judgment that such violations would cause irreparable injury. *Ibid*; see also *United States v. Nutrition Service*, 227 F.Supp. 375, 388–389 (W.D.Pa.1964) *aff'd* 347 F.2d 233 (3rd Cir. 1965). Likewise, the government is not bound to prove the absence of an adequate remedy at law where a statute authorizes an injunction. *Bowles v. Huff*, 146 F.2d 428, 430 (9th Cir. 1944).

The purpose of an injunction is to restrain defendants' further violations of the law. *United States v. W. T. Grant*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *United States v. Richberg*, 398 F.2d 523, 531 (5th Cir. 1968). In exercising its discretion, a court may, and should, " . . . consider the past as a key for the future." *Bowles v. Lentin*, 151 F.2d 615, 620 (7th Cir. 1945); *United States v. Richberg, supra* at 531. The requirements for injunctive relief are met when the government establishes that defendants have violated the statute and there exists "some cognizable danger of recurrent violation . . . " *United States v. W. T. Grant, supra*, 345 U.S. at 633, 73 S.Ct. at 898. Once the government establishes the existence of the statutory violation, the burden shifts to the defendants to show that " 'there is no reasonable expectation that the wrong will be repeated'." *Ibid.*

■ A claim by defendants that they are ready to cease violating the law is una-vailing, for mere cessation of violative activities is not, of itself, grounds for denial of a statutory injunction sought to protect the public health. *United States v. An Article of Drug . . . B Complex Cholinos Capsules*, 362 F.2d 923, 928 (3rd Cir. 1966); *United States v. W. T. Grant, supra; Allee v. Medrano*, 416 U.S. 802, 810–811, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). This is particularly true where such cessation arises only as a result of official pressure or threatened litigation. *Philadelphia Record Co. v. Manufacturing Photo-Engravers Ass'n*, 155 F.2d 799, 804 (3rd Cir. 1946).

### Section 301 Violations

■ Section 301(d) of the Act, 21 U.S.C. § 331(d), prohibits the introduction into interstate commerce, the delivery for such introduction, or the causing thereof, of a new drug for which there is no approved new drug application. In a similar fashion, section 301(a) of the Act, 21 U.S.C. § 331(a), prohibits the introduction into interstate commerce, the delivery for such introduction, or the causing thereof, of a misbranded drug. Given that over the past twelve to eighteen months, the defendants have shipped GH–3, or caused it to be shipped, broadly in interstate commerce, accompanied by labeling which misbrands the drug, defendants have violated sections 301(d) and 301(a) of the Act, and are liable to be enjoined. 21 U.S.C. § 332(a).

Section 301(k) of the Act, 21 U.S.C. § 331(k), prohibits *inter alia*, the doing of any act with respect to a drug "if such act is done while such article is held for sale . . . after shipment in interstate commerce and results in such article being . . misbranded." Here, the defendants compound an unapproved new drug, GH–3, after the procaine hydrochloride has been shipped in interstate commerce, which compounding results in the misbranding of the component. Finally the defendants act while the procaine is held for sale after interstate shipment. The "held for sale" standard of section 301 has long been afforded a liberal reading, encompassing " '[a]ll articles, compound or single, not in-

tended for consumption by the producer.'" *United States v. Cassaro, Inc.*, 443 F.2d 153, 156 (1st Cir. 1971), citing *Hipolite Egg Company v. United States*, 220 U.S. 45, 54, 31 S.Ct. 364, 55 L.Ed. 364 (1911). Thus, defendants' compounding of GH–3 from procaine which has been shipped in interstate commerce results in the misbranding of the bulk procaine while it is held for sale, conduct that violates section 301(k) of the Act, 21 U.S.C. § 331(k), and is liable to be enjoined. 21 U.S.C. § 332(a).

The Court, having heard nearly two full days of testimony on plaintiff's Motion for Preliminary Injunction, and having reviewed many of the several scores of exhibits that have been offered, finds that there is not simply a likelihood, but a great likelihood, of success by the government at the final hearing on the merits in this matter. Moreover, the Court finds that the public interest has definitely been established and that that interest outweighs any harm to the defendants which issuance of an injunction might cause.

In view of the need to protect the public health and safety, and given that the government has established a great likelihood of ultimately prevailing on the merits in this matter, it is hereby

ORDERED AND ADJUDGED, as follows:

I. That plaintiff's Motion for Preliminary Injunction ought to be, and hereby is, GRANTED. The defendants, their officers, agents, servants, employees, and all those persons in active concert or participation with them who receive actual notice of this Order are hereby enjoined, pending final adjudication herein, and until the further order of this Court, from doing or causing to be done, directly or indirectly, any of the following with respect to articles of drug designated as "(Sene X) GH–3 (Equivalent)" or "GH–3 (Equivalent)", containing procaine hydrochloride 2% as the active ingredient, the same article designated by any other name, or any other similar article of drug:

(A) Introducing or delivering for introduction into interstate commerce any such article unless and until (1) an approved application filed pursuant to 21 U.S.C. § 355(b) is effective with respect to said drug, or (2) A Notice of Claimed Investigational Exemption for such drug, filed by defendants pursuant to 21 U.S.C. § 355(i) and 21 CFR 312.1, has been accepted as adequate by the Food and Drug Administration.

(B) Introducing or delivering for introduction into interstate commerce any such article of drug so long as the article is misbranded within the meaning of 21 U.S.C. § 352(a) because (1) statements in its labeling represent or suggest, contrary to fact, that the drug has been proven to be of value in the treatment of diseases associated with advanced age, or (2) statements in its labeling concerning the extent of the drug's effectiveness in treating disease are not supported by adequate, well controlled scientific studies; or introducing or delivering for introduction into interstate commerce any labeling or other promotional materials which cause such drug to be so misbranded.

(C) Misbranding, within the meaning of 21 U.S.C. § 352(f)(1), a drug component while it is held for sale after shipment in interstate commerce by using the component to compound an unapproved new drug contrary to FDA regulations.

(D) Promoting, compounding, packing, and/or labeling any such article of drug within the jurisdiction of this Court, while the drug is held for sale after shipment of one or more of its components in interstate commerce, which act(s) of promoting, compounding, packing, and/or labeling result(s) in such drug being misbranded in one or more of the fashions set forth above in subparagraphs B and C.

DONE AND ORDERED at Miami, Florida, this 17 day of October 1979.